780 So.2d 176 (2001)
In re GUARDIANSHIP OF Theresa Marie SCHIAVO, Incapacitated.
Robert Schindler and Mary Schindler, Appellants,
v.
Michael Schiavo, as Guardian of the person of Theresa Marie Schiavo, Appellee.
No. 2D00-1269.
District Court of Appeal of Florida, Second District.
January 24, 2001.
Rehearing Denied February 22, 2001.
*177 Joseph D. Magri of Merkle & Magri, P.A., Tampa, for Appellants.
George J. Felos of Felos & Felos, P.A., Dunedin, for Appellee.
ALTENBERND, Judge.
Robert and Mary Schindler, the parents of Theresa Marie Schiavo, appeal the trial court's order authorizing the discontinuance of artificial life support to their adult daughter. Michael Schiavo, Theresa's husband and guardian, petitioned the trial court in May 1998 for entry of this order. We have carefully reviewed the record. The trial court made a difficult decision after considering all of the evidence and the applicable law. We conclude that the trial court's decision is supported by competent, substantial evidence and that it correctly applies the law. Accordingly, we affirm the decision.
Theresa Marie Schindler was born on December 3, 1963, and lived with or near her parents in Pennsylvania until she married Michael Schiavo on November 10, 1984. Michael and Theresa moved to Florida in 1986. They were happily married and both were employed. They had no children.
On February 25, 1990, their lives changed. Theresa, age 27, suffered a cardiac arrest as a result of a potassium imbalance. Michael called 911, and Theresa was rushed to the hospital. She never regained consciousness.
Since 1990, Theresa has lived in nursing homes with constant care. She is fed and hydrated by tubes. The staff changes her diapers regularly. She has had numerous health problems, but none have been life threatening.
The evidence is overwhelming that Theresa is in a permanent or persistent vegetative state. It is important to understand that a persistent vegetative state is not simply a coma.[1] She is not asleep. She has cycles of apparent wakefulness and apparent sleep without any cognition or awareness. As she breathes, she often makes moaning sounds. Theresa has severe contractures of her hands, elbows, knees, and feet.
Over the span of this last decade, Theresa's brain has deteriorated because of the lack of oxygen it suffered at the time of the heart attack. By mid 1996, the CAT scans of her brain showed a severely abnormal structure. At this point, much of her cerebral cortex is simply gone and has been replaced by cerebral spinal fluid. Medicine cannot cure this condition. Unless an act of God, a true miracle, were to recreate her brain, Theresa will always remain in an unconscious, reflexive state, totally dependent upon others to feed her and care for her most private needs. She could remain in this state for many years.
Theresa has been blessed with loving parents and a loving husband. Many patients in this condition would have been abandoned by friends and family within the first year. Michael has continued to care for her and to visit her all these years. He has never divorced her. He has become a professional respiratory therapist and works in a nearby hospital. As a guardian, he has always attempted to provide optimum treatment for his wife. *178 He has been a diligent watch guard of Theresa's care, never hesitating to annoy the nursing staff in order to assure that she receives the proper treatment.
Theresa's parents have continued to love her and visit her often. No one questions the sincerity of their prayers for the divine miracle that now is Theresa's only hope to regain any level of normal existence. No one questions that they have filed this appeal out of love for their daughter.
This lawsuit is affected by an earlier lawsuit. In the early 1990s, Michael Schiavo, as Theresa's guardian, filed a medical malpractice lawsuit. That case resulted in a sizable award of money for Theresa. This fund remains sufficient to care for Theresa for many years. If she were to die today, her husband would inherit the money under the laws of intestacy. If Michael eventually divorced Theresa in order to have a more normal family life, the fund remaining at the end of Theresa's life would presumably go to her parents.
Since the resolution of the malpractice lawsuit, both Michael and the Schindlers have become suspicious that the other party is assessing Theresa's wishes based upon their own monetary self-interest. The trial court discounted this concern, and we see no evidence in this record that either Michael or the Schindlers seek monetary gain from their actions. Michael and the Schindlers simply cannot agree on what decision Theresa would make today if she were able to assess her own condition and make her own decision.
There has been discussion among the parties that the money remaining when Theresa dies should be given to a suitable charity as a lasting memorial. If anything is undeniable in this case, it is that Theresa would never wish for this money to drive a wedge between the people she loves. We have no jurisdiction over the disposition of this money, but hopefully these parties will consider Theresa's desires and her memory when a decision about the money is ultimately required.
This is a case to authorize the termination of life-prolonging procedures under chapter 765, Florida Statutes (1997), and under the constitutional guidelines enunciated in In re Guardianship of Browning, 568 So.2d 4 (Fla.1990).[2] The Schindlers have raised three legal issues that warrant brief discussion.
First, the Schindlers maintain that the trial court was required to appoint a guardian ad litem for this proceeding because Michael stands to inherit under the laws of intestacy. When a living will or other advance directive does not exist, it stands to reason that the surrogate decision-maker will be a person who is close to the patient and thereby likely to inherit from the patient. See § 765.401, Fla.Stat. (2000). Thus, the fact that a surrogate decision-maker may ultimately inherit from the patient should not automatically compel the appointment of a guardian. On the other hand, there may be occasions when an inheritance could be a reason to question a surrogate's ability to make an objective decision.
In this case, however, Michael Schiavo has not been allowed to make a decision to disconnect life-support. The Schindlers have not been allowed to make a decision to maintain life-support. Each party in this case, absent their disagreement, might have been a suitable surrogate decision-maker for Theresa. Because Michael Schiavo and the Schindlers could not agree on the proper decision and the inheritance issue created the appearance of conflict, Michael Schiavo, as the guardian of Theresa, invoked the trial court's jurisdiction to allow the trial court to serve as the surrogate decision-maker.
*179 In this court's decision in In re Guardianship of Browning, 543 So.2d 258, 273-74 (Fla. 2d DCA 1989), we described, in dicta, a method for judicial review of a surrogate's decision. The supreme court's decision affirming In re Guardianship of Browning did not squarely approve or reject the details of our proposed method. However, the supreme court recognized that the circuit court's jurisdiction could be invoked in two manners:
We emphasize, as did the district court, that courts are always open to adjudicate legitimate questions pertaining to the written or oral instructions. First, the surrogate or proxy may choose to present the question to the court for resolution. Second, interested parties may challenge the decision of the proxy or surrogate.
In re Guardianship of Browning, 568 So.2d at 16 (footnote omitted).
In this case, Michael Schiavo used the first approach. Under these circumstances, the two parties, as adversaries, present their evidence to the trial court. The trial court determines whether the evidence is sufficient to allow it to make the decision for the ward to discontinue life support. In this context, the trial court essentially serves as the ward's guardian. Although we do not rule out the occasional need for a guardian in this type of proceeding, a guardian ad litem would tend to duplicate the function of the judge, would add little of value to this process, and might cause the process to be influenced by hearsay or matters outside the record. Accordingly, we affirm the trial court's discretionary decision in this case to proceed without a guardian ad litem.
Second, the Schindlers argue that the trial court should not have heard evidence from Beverly Tyler, the executive director of Georgia Health Decisions. Although it is doubtful that this issue is preserved for appeal, we have reviewed the issue as if it were. Ms. Tyler has studied American values, opinions, and attitudes about the decision to discontinue life-support systems. As a result, she has some special expertise concerning the words and expressions that Americans often use in discussing these difficult issues. She also has knowledge about trends within American attitudes on this subject.
We have considerable doubt that Ms. Tyler's testimony provided much in the way of relevant evidence. She testified about some social science surveys. Apparently most people, even those who favor initial life-supporting medical treatment, indicate that they would not wish this treatment to continue indefinitely once their medical condition presented no reasonable basis for a cure. There is some risk that a trial judge could rely upon this type of survey evidence to make a "best interests" decision for the ward. In this case, however, we are convinced that the trial judge did not give undue weight to this evidence and that the court made a proper surrogate decision rather than a best interests decision.
Finally, the Schindlers argue that the testimony, which was conflicting, was insufficient to support the trial court's decision by clear and convincing evidence. We have reviewed that testimony and conclude that the trial court had sufficient evidence to make this decision. The clear and convincing standard of proof, while very high, permits a decision in the face of inconsistent or conflicting evidence. See In re Guardianship of Browning, 543 So.2d at 273.
In Browning, we stated:
In making this difficult decision, a surrogate decisionmaker should err on the side of life.... In cases of doubt, we must assume that a patient would choose to defend life in exercising his or her right of privacy.
In re Guardianship of Browning, 543 So.2d at 273. We reconfirm today that a court's default position must favor life.
The testimony in this case establishes that Theresa was very young and *180 very healthy when this tragedy struck. Like many young people without children, she had not prepared a will, much less a living will. She had been raised in the Catholic faith, but did not regularly attend mass or have a religious advisor who could assist the court in weighing her religious attitudes about life-support methods. Her statements to her friends and family about the dying process were few and they were oral. Nevertheless, those statements, along with other evidence about Theresa, gave the trial court a sufficient basis to make this decision for her.
In the final analysis, the difficult question that faced the trial court was whether Theresa Marie Schindler Schiavo, not after a few weeks in a coma, but after ten years in a persistent vegetative state that has robbed her of most of her cerebrum and all but the most instinctive of neurological functions, with no hope of a medical cure but with sufficient money and strength of body to live indefinitely, would choose to continue the constant nursing care and the supporting tubes in hopes that a miracle would somehow recreate her missing brain tissue, or whether she would wish to permit a natural death process to take its course and for her family members and loved ones to be free to continue their lives. After due consideration, we conclude that the trial judge had clear and convincing evidence to answer this question as he did.
Affirmed.
PARKER, A.C.J., and BLUE, J., concur.
NOTES
[1] For more extensive discussions of persistent vegetative state, see Dorothy J. McNoble, The Cruzan DecisionA Surgeon's Perspective, 20 Mem. St. U.L.Rev. 569, 610 n. 3 (1990); John B. Oldershaw, M.D., J.D., et al., Persistent Vegetative State: Medical, Religious, Economic and Legal Perspectives, 1 DePaul J. Health Care L. 495-536 (1997).
[2] This case does not involve section 765.404, Florida Statutes (2000). This new legislative enactment permits use of a "best interests" standard for discontinuing life-prolonging procedures when a patient in a persistent vegetative state has no friend or family member to serve as a proxy.