885 So.2d 321 (2004)
Jeb BUSH, Governor of Florida, et al., Appellants,
v.
Michael SCHIAVO, Guardian of Theresa Schiavo, Appellee.
No. SC04-925.
Supreme Court of Florida.
September 23, 2004.
Rehearing Denied October 21, 2004.
*323 Kenneth L. Connor and Camille Godwin of Wilkes and McHugh, P.A., Tampa, FL, and Robert A. Destro, Washington, DC, on behalf of Jeb Bush, Governor of the State of Florida; and Charles J. Crist, Jr., Attorney General, George Lemieux, Deputy Attorney General, Chief of Staff, and Jay Vail, Senior Assistant Attorney General, Tallahassee, FL, for Appellant.
George J. Felos of Felos and Felos, P.A., Dunedin, FL, Randall C. Marshall, Legal Director of American Civil Liberties Union of Florida, Miami, FL, and Thomas J. Perrelli and Robert M. Portman of Jenner and Block, LLC, Washington, DC, on behalf of Michael Schiavo, as Guardian of the person of Theresa Marie Schiavo, for Appellee.
Jan G. Halisky, Clearwater, FL, and William L. Saunders, Jr., Director and Counsel, Washington, DC, for Center for Human Life and Bioethics at the Family Research Council, Amici Curiae; George K. Rahdert of Rahdert, Steele, Bryan and Bole, P.A., St. Petersburg, FL, and Max Lapertosa, Chicago, IL, for Not Dead Yet, Adapt, The ARC of the United States, Center on Human Policy, Syracuse University, Center on Self Determination, Disability Rights Center, Freedom Clearinghouse, Hospice Patients' Alliance, Mouth Magazine, National Council on Independent Living, National Disabled Students Union, National Spinal Cord Injury Association, Self-Advocates Becoming Empowered, Society for Disability Studies, TASH, World Association of Persons With Disabilities and World Institute on Disability, *324 Amici Curiae; Patricia Fields Anderson, St. Petersburg, FL, Barbara J. Weller and David Charles Gibbs, III of Gibbs Law Firm, P.A., Seminole, FL, Jay Alan Sekulow, James H. Henderson, Sr., Walter M. Weber and David A. Cortman, Washington, DC, for Robert and Mary Schindler, Amici Curiae; Mary L. Wakeman, Russell E. Carlisle, Lauchlin T. Waldoch and Edwin M. Boyer, Tallahassee, FL, for the Academy of Florida Elder Law Attorneys, Inc., and the National Academy of Elder Law Attorneys, Amici Curiae; Scott M. Solkoff, Chair, Mary L. Wakeman, and Lauchlin T. Waldoch, Tallahassee, FL for The Elder Law Section of the Florida Bar, Amicus Curiae; and Jon B. Eisenberg and David S. Ettinger of Horvitz and Levy, LLP, Encino, California and Bruce G. Howie, St. Petersburg, FL, for 55 Bioethicists and Autonomy, Inc., Amici Curiae.
PARIENTE, C.J.
The narrow issue in this case requires this Court to decide the constitutionality of a law passed by the Legislature that directly affected Theresa Schiavo, who has been in a persistent vegetative state since 1990.[1] This Court, after careful consideration of the arguments of the parties and amici, the constitutional issues raised, the precise wording of the challenged law, and the underlying procedural history of this case, concludes that the law violates the fundamental constitutional tenet of separation of powers and is therefore unconstitutional both on its face and as applied to Theresa Schiavo. Accordingly, we affirm the trial court's order declaring the law unconstitutional.

FACTS AND PROCEDURAL HISTORY
The resolution of the discrete separation of powers issue presented in this case does not turn on the facts of the underlying guardianship proceedings that resulted in the removal of Theresa's nutrition and hydration tube. The underlying litigation, which has pitted Theresa's husband, Michael Schiavo, against Theresa's parents, turned on whether the procedures sustaining Theresa's life should be discontinued. However, the procedural history is important because it provides the backdrop to the Legislature's enactment of the challenged law. We also detail the facts and procedural history in light of the Governor's assertion that chapter 2003-418, Laws of Florida (hereinafter sometimes referred to as "the Act"), was passed in order to protect the due process rights of Theresa and other individuals in her position.
As set forth in the Second District's first opinion in this case, which upheld the guardianship court's final order,
Theresa Marie Schindler was born on December 3, 1963, and lived with or near her parents in Pennsylvania until she married Michael Schiavo on November 10, 1984. Michael and Theresa moved to Florida in 1986. They were happily married and both were employed. They had no children.
On February 25, 1990, their lives changed. Theresa, age 27, suffered a cardiac arrest as a result of a potassium imbalance. Michael called 911, and Theresa was rushed to the hospital. She never regained consciousness.

*325 Since 1990, Theresa has lived in nursing homes with constant care. She is fed and hydrated by tubes. The staff changes her diapers regularly. She has had numerous health problems, but none have been life threatening.
In re Guardianship of Schiavo, 780 So.2d 176, 177 (Fla. 2d DCA 2001) (Schiavo I).
For the first three years after this tragedy, Michael and Theresa's parents, Robert and Mary Schindler, enjoyed an amicable relationship. However, that relationship ended in 1993 and the parties literally stopped speaking to each other. In May of 1998, eight years after Theresa lost consciousness, Michael petitioned the guardianship court to authorize the termination of life-prolonging procedures. See id. By filing this petition, which the Schindlers opposed, Michael placed the difficult decision in the hands of the court.
After a trial, at which both Michael and the Schindlers presented evidence, the guardianship court issued an extensive written order authorizing the discontinuance of artificial life support. The trial court found by clear and convincing evidence that Theresa Schiavo was in a persistent vegetative state and that Theresa would elect to cease life-prolonging procedures if she were competent to make her own decision. This order was affirmed on direct appeal, see Schiavo I, 780 So.2d at 177, and we denied review. See In re Guardianship of Schiavo, 789 So.2d 348 (Fla.2001).
The severity of Theresa's medical condition was explained by the Second District as follows:
The evidence is overwhelming that Theresa is in a permanent or persistent vegetative state. It is important to understand that a persistent vegetative state is not simply a coma. She is not asleep. She has cycles of apparent wakefulness and apparent sleep without any cognition or awareness. As she breathes, she often makes moaning sounds. Theresa has severe contractures of her hands, elbows, knees, and feet.
Over the span of this last decade, Theresa's brain has deteriorated because of the lack of oxygen it suffered at the time of the heart attack. By mid 1996, the CAT scans of her brain showed a severely abnormal structure. At this point, much of her cerebral cortex is simply gone and has been replaced by cerebral spinal fluid. Medicine cannot cure this condition. Unless an act of God, a true miracle, were to recreate her brain, Theresa will always remain in an unconscious, reflexive state, totally dependent upon others to feed her and care for her most private needs. She could remain in this state for many years.
Schiavo I, 780 So.2d at 177. In affirming the trial court's order, the Second District concluded by stating:
In the final analysis, the difficult question that faced the trial court was whether Theresa Marie Schindler Schiavo, not after a few weeks in a coma, but after ten years in a persistent vegetative state that has robbed her of most of her cerebrum and all but the most instinctive of neurological functions, with no hope of a medical cure but with sufficient money and strength of body to live indefinitely, would choose to continue the constant nursing care and the supporting tubes in hopes that a miracle would somehow recreate her missing brain tissue, or whether she would wish to permit a natural death process to take its course and for her family members and loved ones to be free to continue their lives. After due consideration, we conclude that the trial judge had clear and convincing *326 evidence to answer this question as he did.
Schiavo I, 780 So.2d at 180.
Although the guardianship court's final order authorizing the termination of life-prolonging procedures was affirmed on direct appeal, the litigation continued because the Schindlers began an attack on the final order. The Schindlers filed a motion for relief from judgment under Florida Rule of Civil Procedure 1.540(b)(2) and (3) in the guardianship court, alleging newly discovered evidence and intrinsic fraud. The Schindlers also filed a separate complaint in the civil division of the circuit court, challenging the final judgment of the guardianship court. See In re Guardianship of Schiavo, 792 So.2d 551, 555-56 (Fla. 2d DCA 2001) (Schiavo II).
The trial court determined that the post-judgment motion was untimely and the Schindlers appealed. The Second District agreed that the guardianship court had appropriately denied the rule 1.540(b)(2) and (3) motion as untimely. See Schiavo II, 792 So.2d at 558. The Second District also reversed an injunction entered in the case pending before the civil division of the circuit court. See id. at 562. However, the Second District determined that the Schindlers, as "interested parties," had standing to file either a motion for relief from judgment under Florida Rule of Civil Procedure 1.540(b)(5) or an independent action in the guardianship court to challenge the judgment on the ground that it is "no longer equitable for the trial court to enforce its earlier order." Schiavo II, 792 So.2d at 560 (quotation marks omitted). Nonetheless, the Second District pointedly cautioned
that any proceeding to challenge a final order on this basis is extraordinary and should not be filed merely to delay an order with which an interested party disagrees or to retry an adversary proceeding. The interested party must establish that new circumstances make it no longer equitable to enforce the earlier order. In this case, if the Schindlers believe a valid basis for relief from the order exists, they must plead and prove newly discovered evidence of such a substantial nature that it proves either (1) that Mrs. Schiavo would not have made the decision to withdraw life-prolonging procedures fourteen months earlier when the final order was entered, or (2) that Mrs. Schiavo would make a different decision at this time based on developments subsequent to the earlier court order.
Id. at 554.
On remand, the Schindlers filed a timely motion for relief from judgment pursuant to rule 1.540(b)(5). See In re Guardianship of Schiavo, 800 So.2d 640, 642 (Fla. 2d DCA 2001) (Schiavo III). The trial court summarily denied the motion but the Second District reversed and remanded to the guardianship court for the purpose of conducting a limited evidentiary hearing:
Of the four issues resolved in the original trial ..., we conclude that the motion establishes a colorable entitlement only as to the fourth issue. As to that issue  whether there was clear and convincing evidence to support the determination that Mrs. Schiavo would choose to withdraw the life-prolonging procedures  the motion for relief from judgment alleges evidence of a new treatment that could dramatically improve Mrs. Schiavo's condition and allow her to have cognitive function to the level of speech. In our last opinion we stated that the Schindlers had "presented no medical evidence suggesting that any new treatment could restore to Mrs. Schiavo a level of function within the cerebral cortex that would allow her to understand her perceptions of sight and *327 sound or to communicate or respond cognitively to those perceptions." Schiavo II, 792 So.2d at 560. Although we have expressed some lay skepticism about the new affidavits, the Schindlers now have presented some evidence, in the form of the affidavit of Dr. [Fred] Webber, of such a potential new treatment.
Id. at 645.
The Second District permitted the Schindlers to present evidence to establish by a preponderance of the evidence that the judgment was no longer equitable and specifically held:
To meet this burden, they must establish that new treatment offers sufficient promise of increased cognitive function in Mrs. Schiavo's cerebral cortex  significantly improving the quality of Mrs. Schiavo's life  so that she herself would elect to undergo this treatment and would reverse the prior decision to withdraw life-prolonging procedures.
Id. The Second District required an additional set of medical examinations of Theresa and instructed that one of the physicians must be a new, independent physician selected either by the agreement of the parties or, if they could not agree, by the appointment of the guardianship court. See id. at 646.
After conducting a hearing for the purpose set forth in the Second District's decision, the guardianship court denied the Schindlers' motion for relief from judgment. See In re Guardianship of Schiavo, 851 So.2d 182, 183 (Fla. 2d DCA 2003) (Schiavo IV). In reviewing the trial court's order, the Second District explained that it was "not reviewing a final judgment in this appellate proceeding. The final judgment was entered several years ago and has already been affirmed by this court." Id. at 185-86. However, the Second District carefully examined the record:
Despite our decision that the appropriate standard of review is abuse of discretion, this court has closely examined all of the evidence in this record. We have repeatedly examined the videotapes, not merely watching short segments but carefully observing the tapes in their entirety. We have examined the brain scans with the eyes of educated laypersons and considered the explanations provided by the doctors in the transcripts. We have concluded that, if we were called upon to review the guardianship court's decision de novo, we would still affirm it.
Id. at 186. Finally, the Second District concluded its fourth opinion in the Schiavo case with the following observation:
The judges on this panel are called upon to make a collective, objective decision concerning a question of law. Each of us, however, has our own family, our own loved ones, our own children. From our review of the videotapes of Mrs. Schiavo, despite the irrefutable evidence that her cerebral cortex has sustained the most severe of irreparable injuries, we understand why a parent who had raised and nurtured a child from conception would hold out hope that some level of cognitive function remained. If Mrs. Schiavo were our own daughter, we could not but hold to such a faith.
But in the end, this case is not about the aspirations that loving parents have for their children. It is about Theresa Schiavo's right to make her own decision, independent of her parents and independent of her husband.... It may be unfortunate that when families cannot agree, the best forum we can offer for this private, personal decision is a public courtroom and the best decisionmaker *328 we can provide is a judge with no prior knowledge of the ward, but the law currently provides no better solution that adequately protects the interests of promoting the value of life. We have previously affirmed the guardianship court's decision in this regard, and we now affirm the denial of a motion for relief from that judgment.
Id. at 186-87. We denied review, see In re Guardianship of Schiavo, 855 So.2d 621 (Fla.2003), and Theresa's nutrition and hydration tube was removed on October 15, 2003.
On October 21, 2003, the Legislature enacted chapter 2003-418, the Governor signed the Act into law, and the Governor issued executive order No. 03-201 to stay the continued withholding of nutrition and hydration from Theresa. The nutrition and hydration tube was reinserted pursuant to the Governor's executive order.
On the same day, Michael Schiavo brought the action for declaratory judgment in the circuit court. Relying on undisputed facts and legal argument, the circuit court entered a final summary judgment on May 6, 2004, in favor of Michael Schiavo, finding the Act unconstitutional both on its face and as applied to Theresa. Specifically, the circuit court found that chapter 2003-418 was unconstitutional on its face as an unlawful delegation of legislative authority and as a violation of the right to privacy, and unconstitutional as applied because it allowed the Governor to encroach upon the judicial power and to retroactively abolish Theresa's vested right to privacy.[2]

ANALYSIS
We begin our discussion by emphasizing that our task in this case is to review the constitutionality of chapter 2003-418, not to reexamine the guardianship court's orders directing the removal of Theresa's nutrition and hydration tube, or to review the Second District's numerous decisions in the guardianship case. Although we recognize that the parties continue to dispute the findings made in the prior proceedings, these proceedings are relevant to our decision only to the extent that they occurred and resulted in a final judgment directing the withdrawal of life-prolonging procedures.[3]
The language of chapter 2003-418 is clear. It states in full:
Section 1. (1) The Governor shall have the authority to issue a one-time stay to prevent the withholding of nutrition and hydration from a patient if, as of October 15, 2003:
(a) That patient has no written advance directive;
(b) The court has found that patient to be in a persistent vegetative state;
(c) That patient has had nutrition and hydration withheld; and
(d) A member of that patient's family has challenged the withholding of nutrition and hydration.
(2) The Governor's authority to issue the stay expires 15 days after the effective date of this act, and the expiration of the authority does not impact the validity or the effect of any stay issued pursuant to this act. The Governor may lift the stay authorized under this act at *329 any time. A person may not be held civilly liable and is not subject to regulatory or disciplinary sanctions for taking any action to comply with a stay issued by the Governor pursuant to this act.
(3) Upon issuance of a stay, the chief judge of the circuit court shall appoint a guardian ad litem for the patient to make recommendations to the Governor and the court.
Section 2. This act shall take effect upon becoming a law.
Ch.2003-418, Laws of Fla. Thus, chapter 2003-418 allowed the Governor to issue a stay to prevent the withholding of nutrition and hydration from a patient under the circumstances provided for in subsections (1)(a)-(d). Under the fifteen-day sunset provision, the Governor's authority to issue the stay expired on November 5, 2003. See id. The Governor's authority to lift the stay continues indefinitely.

SEPARATION OF POWERS
The cornerstone of American democracy known as separation of powers recognizes three separate branches of government  the executive, the legislative, and the judicial  each with its own powers and responsibilities. In Florida, the constitutional doctrine has been expressly codified in article II, section 3 of the Florida Constitution, which not only divides state government into three branches but also expressly prohibits one branch from exercising the powers of the other two branches:
Branches of Government.  The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
"This Court ... has traditionally applied a strict separation of powers doctrine," State v. Cotton, 769 So.2d 345, 353 (Fla.2000), and has explained that this doctrine "encompasses two fundamental prohibitions. The first is that no branch may encroach upon the powers of another. The second is that no branch may delegate to another branch its constitutionally assigned power." Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991) (citation omitted).
The circuit court found that chapter 2003-418 violates both of these prohibitions, and we address each separately below. Our standard of review is de novo. See Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001) (stating that a trial court's ruling on a motion for summary judgment posing a pure question of law is subject to de novo review).

Encroachment on the Judicial Branch
We begin by addressing the argument that, as applied to Theresa Schiavo, the Act encroaches on the power and authority of the judicial branch. More than 140 years ago this Court explained the foundation of Florida's express separation of powers provision:
The framers of the Constitution of Florida, doubtless, had in mind the omnipotent power often exercised by the British Parliament, the exercise of judicial power by the Legislature in those States where there are no written Constitutions restraining them, when they wisely prohibited the exercise of such powers in our State.
That Convention was composed of men of the best legal minds in the country  men of experience and skilled in the law  who had witnessed the breaking down by unrestrained legislation all the security of property derived from contract, the divesting of vested rights by doing away the force of the law as decided, the overturning of solemn decisions *330 of the Courts of the last resort, by, under the pretence of remedial acts, enacting for one or the other party litigants such provisions as would dictate to the judiciary their decision, and leaving everything which should be expounded by the judiciary to the variable and ever-changing mind of the popular branch of the Government.
Trustees Internal Improvement Fund v. Bailey, 10 Fla. 238, 250 (1863). Similarly, the framers of the United States Constitution recognized the need to establish a judiciary independent of the legislative branch. Indeed, the desire to prevent Congress from using its power to interfere with the judgments of the courts was one of the primary motivations for the separation of powers established at this nation's founding:
This sense of a sharp necessity to separate the legislative from the judicial power, prompted by the crescendo of legislative interference with private judgments of the courts, triumphed among the Framers of the new Federal Constitution. The Convention made the critical decision to establish a judicial department independent of the Legislative Branch.... Before and during the debates on ratification, Madison, Jefferson, and Hamilton each wrote of the factional disorders and disarray that the system of legislative equity had produced in the years before the framing; and each thought that the separation of the legislative from the judicial power in the new Constitution would cure them. Madison's Federalist No. 48, the famous description of the process by which "[t]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex," referred to the report of the Pennsylvania Council of Censors to show that in that State "cases belonging to the judiciary department [had been] frequently drawn within legislative cognizance and determination." Madison relied as well on Jefferson's Notes on the State of Virginia, which mentioned, as one example of the dangerous concentration of governmental powers into the hands of the legislature, that "the Legislature ... in many instances decided rights which should have been left to judiciary controversy."
Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 221-22, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (citations omitted).
Under the express separation of powers provision in our state constitution, "the judiciary is a coequal branch of the Florida government vested with the sole authority to exercise the judicial power," and "the legislature cannot, short of constitutional amendment, reallocate the balance of power expressly delineated in the constitution among the three coequal branches." Children A, B, C, D, E, & F, 589 So.2d at 268-69; see also Office of State Attorney v. Parrotino, 628 So.2d 1097, 1099 (Fla.1993) ("[T]he legislature cannot take actions that would undermine the independence of Florida's judicial ... offices.").
As the United States Supreme Court has explained, the power of the judiciary is "not merely to rule on cases, but to decide them, subject to review only by superior courts" and "[h]aving achieved finality ... a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy." Plaut, 514 U.S. at 218-19, 227, 115 S.Ct. 1447. Moreover, "purely judicial acts ... are not subject to review as to their accuracy by the Governor." In re Advisory Opinion to the Governor, 213 So.2d 716, 720 (Fla.1968); see also Children A, B, C, D, E, & F, 589 So.2d at 269 ("The judicial branch cannot be subject in *331 any manner to oversight by the executive branch.").
In Advisory Opinion, the Governor asked the Court whether he had the "constitutional authority to review the judicial accuracy and propriety of [a judge] and to suspend him from office if it does not appear ... that the Judge has exercised proper judicial discretion and wisdom." 213 So.2d at 718. The Court agreed that the Governor had the authority to suspend a judge on the grounds of incompetency "if the physical or mental incompetency is established and determined within the Judicial Branch by a court of competent jurisdiction." Id. at 720. However, the Court held that the Governor did not have the power to "review the judicial discretion and wisdom of a ... Judge while he is engaged in the judicial process." Id. The Court explained that article V of the Florida Constitution provides for appellate review for the benefit of litigants aggrieved by the decisions of the lower court, and that "[a]ppeal is the exclusive remedy." Id.
In this case, the undisputed facts show that the guardianship court authorized Michael to proceed with the discontinuance of Theresa's life support after the issue was fully litigated in a proceeding in which the Schindlers were afforded the opportunity to present evidence on all issues. This order as well as the order denying the Schindlers' motion for relief from judgment were affirmed on direct appeal. See Schiavo I, 780 So.2d at 177; Schiavo IV, 851 So.2d at 183. The Schindlers sought review in this Court, which was denied. Thereafter, the tube was removed. Subsequently, pursuant to the Governor's executive order, the nutrition and hydration tube was reinserted. Thus, the Act, as applied in this case, resulted in an executive order that effectively reversed a properly rendered final judgment and thereby constituted an unconstitutional encroachment on the power that has been reserved for the independent judiciary. Cf. Bailey, 10 Fla. at 249-50 (noting that had the statute under review "directed a rehearing, the hearing of the case would necessarily carry with it the right to set aside the judgment of the Court, and there would be unquestionably an exercise of judicial power").
The Governor and amici assert that the Act does not reverse a final court order because an order to discontinue life-prolonging procedures may be challenged at any time prior to the death of the ward. In advancing this argument, the Governor and amici rely on the Second District's conclusion that as long as the ward is alive, an order discontinuing life-prolonging procedures "is subject to recall and is executory in nature." Schiavo II, 792 So.2d at 559. However, the Second District did not hold that the guardianship court's order was not a final judgment but, rather, that the Schindlers, as interested parties, could file a motion for relief from judgment under Florida Rule of Civil Procedure 1.540(b)(5) if they sufficiently alleged that it is no longer equitable that the judgment have prospective application. See id. at 561. Rule 1.540(b) expressly states that a motion filed pursuant to its terms "does not affect the finality of a judgment." Further, the fact that a final judgment may be subject to recall under a rule of procedure, if certain circumstances can be proved, does not negate its finality. Unless and until the judgment is vacated by judicial order, it is "the last word of the judicial department with regard to a particular case or controversy." Plaut, 514 U.S. at 227, 115 S.Ct. 1447.
Under procedures enacted by the Legislature, effective both before the passage of the Act and after its fifteen-day effective period expired, circuit courts are charged with adjudicating issues regarding *332 incompetent individuals. The trial courts of this State are called upon to make many of the most difficult decisions facing society. In proceedings under chapter 765, Florida Statutes (2003), these decisions literally affect the lives or deaths of patients. The trial courts also handle other weighty decisions affecting the welfare of children such as termination of parental rights and child custody. See § 61.13(2)(b)(1), Fla. Stat. (2003) ("The court shall determine all matters relating to custody of each minor child of the parties in accordance with the best interests of the child and in accordance with the Uniform Child Custody Jurisdiction and Enforcement Act."); § 39.801(2), Fla. Stat. (2003) ("The circuit court shall have exclusive original jurisdiction of a proceeding involving termination of parental rights."). When the prescribed procedures are followed according to our rules of court and the governing statutes, a final judgment is issued, and all post-judgment procedures are followed, it is without question an invasion of the authority of the judicial branch for the Legislature to pass a law that allows the executive branch to interfere with the final judicial determination in a case. That is precisely what occurred here and for that reason the Act is unconstitutional as applied to Theresa Schiavo.

Delegation of Legislative Authority
In addition to concluding that the Act is unconstitutional as applied in this case because it encroaches on the power of the judicial branch, we further conclude that the Act is unconstitutional on its face because it delegates legislative power to the Governor. The Legislature is permitted to transfer subordinate functions "to permit administration of legislative policy by an agency with the expertise and flexibility to deal with complex and fluid conditions." Microtel, Inc. v. Fla. Public Serv. Comm'n, 464 So.2d 1189, 1191 (Fla.1985). However, under article II, section 3 of the constitution the Legislature "may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law." Sims v. State, 754 So.2d 657, 668 (Fla.2000). This prohibition, known as the nondelegation doctrine, requires that "fundamental and primary policy decisions ... be made by members of the legislature who are elected to perform those tasks, and [that the] administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program." Askew v. Cross Key Waterways, 372 So.2d 913, 925 (Fla.1978); see also Avatar Dev. Corp. v. State, 723 So.2d 199, 202 (Fla.1998) (citing Askew with approval). In other words, statutes granting power to the executive branch "must clearly announce adequate standards to guide ... in the execution of the powers delegated. The statute must so clearly define the power delegated that the [executive] is precluded from acting through whim, showing favoritism, or exercising unbridled discretion." Lewis v. Bank of Pasco County, 346 So.2d 53, 55-56 (Fla.1976). The requirement that the Legislature provide sufficient guidelines also ensures the availability of meaningful judicial review:
In the final analysis it is the courts, upon a challenge to the exercise or nonexercise of administrative action, which must determine whether the administrative agency has performed consistently with the mandate of the legislature. When legislation is so lacking in guidelines that neither the agency nor the courts can determine whether the agency is carrying out the intent of the legislature in its conduct, then, in fact, the agency becomes the lawgiver rather than the administrator of the law.
Askew, 372 So.2d at 918-19.
We have recognized that the "specificity of the guidelines [set forth in *333 the legislation] will depend on the complexity of the subject and the `degree of difficulty involved in articulating finite standards.'" Brown v. Apalachee Regional Planning Council, 560 So.2d 782, 784 (Fla.1990) (quoting Askew, 372 So.2d at 918). However, we have also made clear that "[e]ven where a general approach would be more practical than a detailed scheme of legislation, enactments may not be drafted in terms so general and unrestrictive that administrators are left without standards for the guidance of their official acts." State Dep't of Citrus v. Griffin, 239 So.2d 577, 581 (Fla.1970).
In both Askew and Lewis, this Court held that the respective statutes under review violated the nondelegation doctrine because they failed to provide the executive branch with adequate guidelines and criteria. In Askew, the Court invalidated a statute that directed the executive branch to designate certain areas of the state as areas of critical state concern but did not contain sufficient standards to allow "a reviewing court to ascertain whether the priorities recognized by the Administration Commission comport with the intent of the legislature." 372 So.2d at 919. The statute in question enunciated the following criteria for the Division of State Planning to use in identifying a particular area as one of critical state concern:
(a) An area containing, or having a significant impact upon, environmental, historical, natural, or archaeological resources of regional or statewide importance.
(b) An area significantly affected by, or having a significant effect upon, an existing or proposed major public facility or other area of major public investment.
(c) A proposed area of major development potential, which may include a proposed site of a new community, designated in a state land development plan.
Id. at 914-15 (quoting section 380.05(2), Florida Statutes (1975)). The Court concluded that the criteria for designation of an area of critical concern set forth in subsections (a) and (b) were defective because they gave the executive agency "the fundamental legislative task of determining which geographic areas and resources [were] in greatest need of protection." Id. at 919. With regard to subsection (a), this Court agreed with the district court that the deficiency resulted from the Legislature's failure to "establish or provide for establishing priorities or other means for identifying and choosing among the resources the Act is intended to preserve." Id. (quoting Cross Key Waterways v. Askew, 351 So.2d 1062, 1069 (Fla. 1st DCA 1977)). Subsection (b) suffered a similar defect by expanding "the choice to include areas which in unstated ways affect or are affected by any `major public facility' which is defined in Section 380.031(10), or any `major public investment,' which is not." Id.
Lewis involved a statute that gave the state comptroller the unrestricted power to release banking records to the public that were otherwise considered confidential under the Public Records Act. See 346 So.2d at 55. The statute at issue provided in pertinent part:
Division records.
All bank or trust company applications, investigation reports, examination reports, and related information, including any duly authorized copies in possession of any banking organization, foreign banking corporation, or any other person or agency, shall be confidential communications, other than such documents as are required by law to be published, and shall not be made public, unless with the consent of the department, pursuant *334 to a court order, or in response to legislative subpoena as provided by law.
Lewis, 346 So.2d at 54 (quoting section 658.10, Florida Statutes (1975)) (alteration in original). This Court held that the law was "couched in vague and uncertain terms or is so broad in scope that ... it must be held unconstitutional as attempting to grant to the ... [comptroller] the power to say what the law shall be." 346 So.2d at 56 (quoting Sarasota County v. Barg, 302 So.2d 737, 742 (Fla.1974)) (alterations in original).
In this case, the circuit court found that chapter 2003-418 contains no guidelines or standards that "would serve to limit the Governor from exercising completely unrestricted discretion in applying the law to" those who fall within its terms. The circuit court explained:
The terms of the Act affirmatively confirm the discretionary power conferred upon the Governor. He is given the "authority to issue a one-time stay to prevent the withholding of nutrition and hydration from a patient" under certain circumstances but, he is not required to do so. Likewise, the act provides that the Governor "may lift the stay authorized under this act at any time. The Governor may revoke the stay upon a finding that a change in the condition of the patient warrants revocation." (Emphasis added). In both instances there is nothing to provide the Governor with any direction or guidelines for the exercise of this delegated authority. The Act does not suggest what constitutes "a change in condition of the patient" that could "warrant revocation." Even when such an undefined "change" occurs, the Governor is not compelled to act. The Act confers upon the Governor the unfettered discretion to determine what the terms of the Act mean and when, or if, he may act under it.
We agree with this analysis. In enacting chapter 2003-418, the Legislature failed to provide any standards by which the Governor should determine whether, in any given case, a stay should be issued and how long a stay should remain in effect. Further, the Legislature has failed to provide any criteria for lifting the stay. This absolute, unfettered discretion to decide whether to issue and then when to lift a stay makes the Governor's decision virtually unreviewable.
The Governor asserts that by enacting chapter 2003-418 the Legislature determined that he should be permitted to act as proxy for an incompetent patient in very narrow circumstances and, therefore, that his discretion is limited by the provisions of chapter 765. However, the Act does not refer to the provisions of chapter 765. Specifically, the Act does not amend section 765.401(1), Florida Statutes (2003), which sets forth an order of priority for determining who should act as proxy for an incapacitated patient who has no advance directive. Nor does the Act require that the Governor's decision be made in conformity with the requirement of section 765.401 that the proxy's decision be based on "the decision the proxy reasonably believes that patient would have made under the circumstances" or, if there is no indication of what the patient would have chosen, in the patient's best interests. § 765.401(2)-(3), Fla. Stat. (2003). Finally, the Act does not provide for review of the Governor's decision as proxy as required by section 765.105, Florida Statutes (2003). In short, there is no indication in the language of chapter 2003-418 that the Legislature intended the Governor's discretion to be limited in any way. Even if we were to read chapter 2003-418 in pari materia with chapter 765, as the Governor suggests, there is nothing in chapter 765 to guide the Governor's discretion in issuing *335 a stay because chapter 765 does not contemplate that a proxy will have the type of open-ended power delegated to the Governor under the Act.
We also reject the Governor's argument that this legislation provides an additional layer of due process protection to those who are unable to communicate their wishes regarding end-of-life decisions. Parts I, II, III, and IV of chapter 765, enacted by the Legislature in 1992 and amended several times,[4] provide detailed protections for those who are adjudicated incompetent, including that the proxy's decision be based on what the patient would have chosen under the circumstances or is in the patient's best interest, and be supported by competent, substantial evidence. See § 765.401(2)-(3). Chapter 765 also provides for judicial review if "[t]he patient's family, the health care facility, or the attending physician, or any other interested person who may reasonably be expected to be directly affected by the surrogate or proxy's decision... believes [that] [t]he surrogate or proxy's decision is not in accord with the patient's known desires or *336 the provisions of this chapter." § 765.105(1), Fla. Stat. (2003).
In contrast to the protections set forth in chapter 765, chapter 2003-418's standardless, open-ended delegation of authority by the Legislature to the Governor provides no guarantee that the incompetent patient's right to withdraw life-prolonging procedures will in fact be honored. See In re Guardianship of Browning, 568 So.2d 4, 12 (Fla.1990) (reaffirming that an incompetent person has the same right to refuse medical treatment as a competent person). As noted above, the Act does not even require that the Governor consider the patient's wishes in deciding whether to issue a stay, and instead allows a unilateral decision by the Governor to stay the withholding of life-prolonging procedures without affording any procedural process to the patient.
Finally, we reject the Governor's argument that the Legislature's grant of authority to issue the stay under chapter 2003-418 is a valid exercise of the state's parens patriae power. Although unquestionably the Legislature may enact laws to protect those citizens who are incapable of protecting their own interests, see, e.g., In re Byrne, 402 So.2d 383 (Fla.1981), such laws must comply with the constitution. Chapter 2003-418 fails to do so.
Moreover, the argument that the Act broadly protects those who cannot protect themselves is belied by the case-specific criteria under which the Governor can exercise his discretion. The Act applies only if a court has found the individual to be in a persistent vegetative state and food and hydration have been ordered withdrawn. It does not authorize the Governor to intervene if a person in a persistent vegetative state is dependent upon another form of life support. Nor does the Act apply to a person who is not in a persistent vegetative state but a court finds, contrary to the wishes of another family member, that life support should be withdrawn. In theory, the Act could have applied during its fifteen-day window to more than one person, but it is undeniable that in fact the criteria fit only Theresa Schiavo.
In sum, although chapter 2003-418 applies to a limited class of people, it provides no criteria to guide the Governor's decision about whether to act. In addition, once the Governor has issued a stay as provided for in the Act, there are no criteria for the Governor to evaluate in deciding whether to lift the stay. Thus, chapter 2003-418 allows the Governor to act "through whim, show [ ] favoritism, or exercis[e] unbridled discretion," Lewis, 346 So.2d at 56, and is therefore an unconstitutional delegation of legislative authority.

CONCLUSION
We recognize that the tragic circumstances underlying this case make it difficult to put emotions aside and focus solely on the legal issue presented. We are not insensitive to the struggle that all members of Theresa's family have endured since she fell unconscious in 1990. However, we are a nation of laws and we must govern our decisions by the rule of law and not by our own emotions. Our hearts can fully comprehend the grief so fully demonstrated by Theresa's family members on this record. But our hearts are not the law. What is in the Constitution always must prevail over emotion. Our oaths as judges require that this principle is our polestar, and it alone.
As the Second District noted in one of the multiple appeals in this case, we "are called upon to make a collective, objective decision concerning a question of law. Each of us, however, has our own family, our own loved ones, our own children.... But in the end, this case is not about the *337 aspirations that loving parents have for their children." Schiavo IV, 851 So.2d at 186. Rather, as our decision today makes clear, this case is about maintaining the integrity of a constitutional system of government with three independent and coequal branches, none of which can either encroach upon the powers of another branch or improperly delegate its own responsibilities.
The continuing vitality of our system of separation of powers precludes the other two branches from nullifying the judicial branch's final orders. If the Legislature with the assent of the Governor can do what was attempted here, the judicial branch would be subordinated to the final directive of the other branches. Also subordinated would be the rights of individuals, including the well established privacy right to self determination. See Browning, 568 So.2d at 11-13. No court judgment could ever be considered truly final and no constitutional right truly secure, because the precedent of this case would hold to the contrary. Vested rights could be stripped away based on popular clamor. The essential core of what the Founding Fathers sought to change from their experience with English rule would be lost, especially their belief that our courts exist precisely to preserve the rights of individuals, even when doing so is contrary to popular will.
The trial court's decision regarding Theresa Schiavo was made in accordance with the procedures and protections set forth by the judicial branch and in accordance with the statutes passed by the Legislature in effect at that time. That decision is final and the Legislature's attempt to alter that final adjudication is unconstitutional as applied to Theresa Schiavo. Further, even if there had been no final judgment in this case, the Legislature provided the Governor constitutionally inadequate standards for the application of the legislative authority delegated in chapter 2003-418. Because chapter 2003-418 runs afoul of article II, section 3 of the Florida Constitution in both respects, we affirm the circuit court's final summary judgment.
It is so ordered.
WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO and BELL, JJ., concur.
NOTES
[1] The trial court, in an extensive written order, declared that the law was unconstitutional as a violation of separation of powers, as a violation of the right of privacy and as unconstitutional retroactive legislation. The Second District Court of Appeal certified this case as one of great public importance and requiring immediate resolution by this Court. We have jurisdiction. See art. V, § 3(b)(5), Fla. Const.
[2] Because we find the separation of powers issue to be dispositive in this case, we do not reach the other constitutional issues addressed by the circuit court.
[3] The parties stipulated that the circuit court was authorized to take judicial notice of three orders of the guardianship court. The circuit court relied only on the existence of these orders in finding chapter 2003-418 unconstitutional as applied.
[4] Prior to this Court's decision in In re Guardianship of Browning, 568 So.2d 4 (Fla.1990), statutory law provided a procedure by which a competent adult could provide a declaration instructing his or her physician to withhold or withdraw life-prolonging procedures, or designating another to make the treatment decision. See §§ 765.01-765.17, Fla. Stat. (1991). This law had been in effect since 1984.

In 1992, the Legislature repealed sections 765.01-765.17, see ch. 92-199, § 10 at 1852, Laws of Fla., and enacted Parts I, II, III, and IV of chapter 765. See id. §§ 2-5. The Legislature provided that in the absence of an advance directive, a proxy may make health care decisions for an incapacitated patient. See ch. 92-199, § 5 at 1850 Laws of Fla.; § 765.401 Fla. Stat. (2003). "Health care decisions" include "[i]nformed consent, refusal of consent, or withdrawal of consent to any and all health care, including life-prolonging procedures." Ch. 92-199, § 2 at 1840, Laws of Fla.; § 765.101(5)(a) Fla. Stat. (2003). When the statute was enacted in 1992, the Legislature defined life-prolonging procedures as:
any medical procedure, treatment, or intervention which:
(a) Utilizes mechanical or other artificial means to sustain, restore, or supplant a spontaneous vital function; and
(b) When applied to a patient in a terminal condition, serves only to prolong the process of dying.
Ch. 92-199, § 2 at 1840-41. However, in 1999, the Legislature rewrote the definitions section and defined life-prolonging procedures as:
any medical procedure, treatment, or intervention, including artificially provided sustenance and hydration, which sustains, restores, or supplants a spontaneous vital function. The term does not include the administration of medication or performance of medical procedure, when such medication or procedure is deemed necessary to provide comfort care or to alleviate pain.
Ch. 99-331, § 16 at 3464, Laws of Fla.; § 765.101(10), Fla. Stat. (2003).
In order to determine who is to act as a patient's proxy, the Legislature set forth a detailed order of priority. See ch. 92-199, § 5 at 1851. This order of priority has been amended only once since 1992 to allow a clinical social worker to act as the patient's proxy if none of the other potential proxies are available. See ch.2003-57, § 5, Laws of Fla. The Legislature also provided that a "proxy's decision to withhold or withdraw life-prolonging procedures must by supported by clear and convincing evidence that the decision would have been the one the patient would have chosen had [the patient] been competent." Ch. 92-199, § 5 at 1851, Laws of Fla.; see also § 765.401(3), Fla. Stat. (2003).
Finally, the Legislature provided for judicial review of a proxy's decision if "[t]he patient's family, the health care facility, or the attending physician, or any other interested person who may reasonably be expected to be directly affected by the surrogate or proxy's decision ... believes (1) The surrogate or proxy's decision is not in accord with the patient's known desires or the provisions of this chapter." Ch. 92-199, § 2 at 1842, Laws of Fla.; § 765.105, Fla. Stat. (2003).