[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 30, 2005
THOMAS K. KAHN
CLERK**

_____

No. 05-11628

_____

D.C. Docket No. 05-00530-CV-T-27-TBM

THERESA MARIE SCHINDLER SCHIAVO,
incapacitated ex rel, Robert Schindler and
Mary Schindler, her parents and next friends,

Plaintiff-Appellant,

versus

MICHAEL SCHIAVO,
as guardian of the person of
Theresa Marie Schindler Schiavo, incapacitated,
JUDGE GEORGE W. GREER,
THE HOSPICE OF THE FLORIDA SUNCOAST, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

ON PETITION FOR EXPEDITED REHEARING EN BANC
(Opinion March 25, 2005)

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON, and PRYOR,* Circuit Judges.


O R D E R:

The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Eleventh Circuit Rule 35-5), the Emergency Petition for Rehearing En Banc is DENIED.


/s/ J. L. EDMONDSON
CHIEF JUDGE

_____

* Judge William H. Pryor Jr. did not participate in the consideration of the Petition because he is recovering from surgery performed on Monday, 28 March 2005.

2

BIRCH, Circuit Judge, specially concurring:

I concur in the denial of rehearing en banc in this case because any further action by our court or the district court, would be improper, as I explain below.

An axiom in the study of law is that "hard facts make bad law." The tragic events that have afflicted Mrs. Schiavo and that have been compounded by the resulting passionate inter-family struggle and media focus certainly qualify as "hard facts." And, while the members of her family and the members of Congress have acted in a way that is both fervent and sincere, the time has come for dispassionate discharge of duty.

A popular epithet directed by some members of society, including some members of Congress, toward the judiciary involves the denunciation of "activist judges." Generally, the definition of an "activist judge" is one who decides the outcome of a controversy before him according to personal conviction, even one sincerely held, as opposed to the dictates of the law as constrained by legal precedent and, ultimately, our Constitution. In resolving the Schiavo controversy it is my judgment that, despite sincere and altruistic motivation, the legislative and executive branches of our government have acted in a manner demonstrably at odds with our Founding Fathers' blueprint for the governance of a free people — our Constitution. Since I have sworn, as have they, to uphold and defend that

Covenant, I must respectfully concur in the denial of the request for rehearing en

banc.  I conclude that Pub. L.109-3 ("the Act") is unconstitutional and, therefore,

this court and the district court are without jurisdiction in this case[1] under that

special Act and should refuse to exercise *any* jurisdiction that we may otherwise

have in this case.  Under the first amended complaint in this case (the initial

complaint was improperly grounded on habeas corpus) a basis for jurisdiction was

Pub. L.  109-3.[2]  The second amended complaint adopted other, independent

grounds for jurisdiction, including the Americans With Disabilities Act ("ADA"),

The Civil Rights Act (42 U.S.C. § 1983) and The Rehabilitation Act of 1973.  We

have held that the Rooker-Feldman[3] doctrine is jurisdictional.  Clearly,

---

[1]The court is duty-bound to question at anytime in a proceeding the *bona fides* of its jurisdiction.  Ortiz v. Fibreboard Corp., 527 U.S. 815, 831, 119 S.Ct. 2295, 2307 (1999); National Solid Wastes Mgmt. Ass'n v. Alabama Dep't of Env't Mgmt., 924 F.2d 1001, 1002 (11th Cir. 1991).  Given the rapid developments and sensitivities in this case, the need for deliberative study necessitated the delay in my questioning our jurisdiction.

[2]The entire text of Pub. L. 109-3 is attached as an appendix to this concurrence.

[3]See D.C. Court of Appeals v. Feldman, 460 U.S. 462, 476-82, 103 S. Ct. 1303, 1311-15 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 44 S. Ct. 149, 150 (1923).  Under the Rooker-Feldman doctrine, federal district and circuit courts lack jurisdiction to review the final judgments of state courts.  See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 644 n.3, 122 S. Ct. 1753, 1759 n.3 (2002); Narey v. Dean, 32 F.3d 1521, 1524-25 (11th Cir. 1994).  The doctrine applies where "(1) the party in federal court is the same as the party in state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment." Amos v. Glynn County Bd. of Tax Assessors, 347 F.3d 1249, 1265 n.11 (11th Cir. 2003) (internal citations omitted).  We are mindful that there exists an exception to Rooker-Feldman when a federal

4

application of that doctrine should have been made in this case, the effect of which would have been to decline to exercise any jurisdiction that we or the district court did have under the ADA, the Civil Rights Act or the Rehabilitation Act of 1973.

Since the passage of Pub. L. 109-3 on the morning of March 21, 2005, its constitutionality has been presumed. See Schiavo *ex rel.* Schindler v. Schiavo, No. 8:05-CV-530-T-27TBM (M.D. Fla. Mar. 22, 2005) at 3; Schiavo *ex rel.* Schindler v. Schiavo, No. 05-11556 (11th Cir. March 23, 2005) at 5. In the instant appeal, our court and the district court continue to indulge this presumption and decline to address the constitutionality of the law which purports to grant federal jurisdiction. See Schiavo *ex. rel.* Schindler v. Schiavo, No. 05-11628 (11th Cir. March 25, 2005). Jurisdiction, however, is a prerequisite to the legitimate exercise of judicial power, and therefore we may not hypothetically assume jurisdiction to avoid resolving hard jurisdictional questions. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-94, 118 S. Ct. 1003, 1012 (1998); Ex Parte

statute authorizes federal appellate review of final state court decisions. See Dale v. Moore, 121 F.3d 624, 627 (11th Cir. 1997). However, neither the ADA nor the Rehabilitation Act of 1973 provides an independent source of federal jurisdiction so as to fall within this exception. See id. at 628 (concluding that the ADA does not override Rooker-Feldman); Hason v. Office of Prof'l Med. Conduct, 314 F. Supp. 2d 241, 248 (S.D.N.Y. 2004) (applying Rooker-Feldman to bar claims brought under the Rehabilitation Act). Moreover, Pub.L. 109-3 does not fall within this exception because it is unconstitutional under the separation of powers doctrine as explained herein.

McCardle, 74 U.S. 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause."). I write separately to explain how various provisions of Pub. L. 109-3 are an unconstitutional infringement on the core principles of separation of powers and how this dynamic nullifies the exercise of federal jurisdiction in this case.

**A.** **Pub. L. 109-3 and the Separation of Powers**

It is axiomatic that the Framers established a constitutional design based on the principles of separation of powers. See Marbury v. Madison, 5 U.S. 137, 176 (1803) (noting that separation of powers is one of the governmental principles "on which the whole American fabric has been erected"). The Framers established three coequal but separate branches of government, each with the ability to exercise checks and balances on the two others. And to preserve this dynamic, the "Constitution mandates that 'each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others.'" Mistretta v. United States, 488 U.S. 361, 380, 109 S. Ct. 647, 659 (1989) (quoting Humphrey's Executor v. United States, 295 U.S. 602, 629, 55 S. Ct. 869, 874 (1935)). Because of the important constitutional role assigned to the judiciary by the Framers in safeguarding the Constitution and the rights of individuals, see Federalist No. 78 (A. Hamilton), the execution of this

6

constitutional mandate is particularly important when legislative acts encroach upon the independence of the judiciary. See INS v. Chadha, 462 U.S. 919, 961, 103 S. Ct. 2764, 2789 (1983) (Powell, J. concurring) (citing Federalist No. 48 for the proposition that the Framers enshrined in the Constitution separation of powers principles because of past legislative interference with the judiciary); Northern Pipeline Co. v. Marathon Pipeline Co., 458 U.S. 50, 60, 102 S. Ct. 2858, 2866 (1982) ("[T]he independence of the judiciary [must] be jealously guarded."). Accordingly, we risk imperiling our constitutional design if we do not inquire as to whether Pub. L. 109-3 infringes on the independence of the judiciary guaranteed by Article III of the United States Constitution.

Article III provides that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1. In defining the extent of federal judicial power, Article III provides that "judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority" and to certain other enumerated cases and controversies. Id. at § 2. These provisions have led courts to the unremarkable conclusion that "[f]ederal courts are courts of limited jurisdiction" and may only exercise jurisdiction

7

allowed under the Constitution when "authorized by . . . statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S. Ct. 1673, 1675 (1994). Consistent with this dynamic outlined by Article III, and pursuant to its Article I powers, see U.S. CONST. art. I, § 8, the United States Congress has vested federal courts with original jurisdiction to hear claims "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and claims in which certain amount in controversy and diversity of citizenship criteria are met, see 28 U.S.C. § 1332.

Against these most elementary of constitutional principles, Section 1 of Pub. L. 109-3—which states that the United States District Court for the Middle District of Florida shall have jurisdiction to hear a suit regarding alleged violations of rights held by Mrs. Schiavo "under the Constitution or laws of the United States"—is not facially unconstitutional. If the Act only provided for jurisdiction consistent with Article III and 28 U.S.C. § 1331, the Act would not be in violation of the principles of separation of powers. The Act, however, goes further. Section 2 of the Act provides that the district court: (1) shall engage in "de novo" review of Mrs. Schiavo's constitutional and federal claims; (2) shall not consider whether these claims were previously "raised, considered, or decided in State court proceedings"; (3) shall not engage in "abstention in favor of State court

8

proceedings"; and (4) shall not decide the case on the basis of "whether remedies available in the State courts have been exhausted." Pub. L. 109-3, § 2. Because these provisions constitute legislative dictation of how a federal court should exercise its judicial functions (known as a "rule of decision"), the Act invades the province of the judiciary and violates the separation of powers principle.

An act of Congress violates separation of powers if it requires federal courts to exercise their Article III power "in a manner repugnant to the text, structure, and traditions of Article III." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218, 115 S. Ct. 1447, 1452 (1995). By setting a particular standard of review in the district court, Section 2 of the Act purports to direct a federal court in an area traditionally left to the federal court to decide. See Fla. Progress Corp. v. Comm'r, 348 F.3d 954, 959 (11th Cir. 2004) (noting that the standard of review is for the court to determine). In fact, the establishment of a standard of review often dictates the rule of decision in a case, which is beyond Congress's constitutional power. See United States v. Klein, 80 U.S. 128, 146 (1871) (noting that Congress may not prescribe a "rule of decision" for a particular case). In addition, "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." Loving v. United States, 517 U.S. 748, 757, 116 S. Ct. 1737, 1743 (1996). By denying federal courts the ability to

9

exercise abstention or inquire as to exhaustion or waiver under State law, the Act robs federal courts of judicial doctrines long-established for the conduct of prudential decisionmaking. See Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1237 n.13 (describing abstention as a "prudential" doctrine); Duncan v. Walker, 533 U.S. 167, 178-79, 121 S. Ct. 2120, 2127-28 (2001) (discussing the jurisprudential merits of State remedy exhaustion doctrines); Labat v. Bennett, 365 F.2d 698, 707 (5th Cir. 1966) (discussing courts' use of the doctrine of waiver). In short, certain provisions of Section 2 of the Act attempt to "'direct[] what particular steps shall be taken in the progress of a judicial inquiry,'" Plaut, 514 U.S. at 225, 115 S. Ct. at 1456 (quoting THOMAS COOLEY, CONSTITUTIONAL LIMITATIONS 94-95). Because this is violative of the fundamental principles of separation of powers enshrined in our Constitution, they are unconstitutional. See Plaut, 514 U.S. at 240, 115 S. Ct. at 1463 (finding unconstitutional a congressional act which impinged on the independence of the judiciary by requiring federal courts to reopen federal judgments); Klein, 80 U.S. at 147 (invalidating legislation because "it passed the limit which separates the legislative from the judicial power" by dictating a rule of decision in a pending case).[4] Manifestly, because the

---

[4]In his dissenting opinion, Judge Tjoflat questions why we have not cited any cases for the proposition that Congress cannot, in a statute, withdraw our ability to use the doctrines of abstention, exhaustion and waiver. As we have explained, the Act is unprecedented in nature.

Act applies to only this case[5] it lacks the generality and prospectivity of legislation that comports with the basic tenets of the separation of powers.

In sum, while Congress may grant jurisdiction to a federal court consistent with Article III as it did in Section 1 of the Act,[6] it may not "assume[] a function that more properly is entrusted to" the judiciary.  See INS, 462 U.S. at 963, 103 S. Ct. at 2790 (Powell, J., concurring).  By arrogating vital judicial functions to itself in the passage of the provisions of Section 2 of the Act, Congress violated core constitutional separation principles, it prescribed a "rule of decision" and acted unconstitutionally.

## B.    Pub. L. 109-3 and Severability

Recognizing that the provisions of Section 2 of the Act are unconstitutional, it remains to be determined whether such unconstitutionality renders the entire Act

My reading of Plaut, 514 U.S. 211 (1995), demonstrates that unprecedented congressional acts can be lacking in constitutional propriety absent prior precedent.  Moreover, I do not suggest that the provision of a standard of review is in a general sense a "rule of decision."  Rather, it is the abrogation of such standards in a *single* case, not in a category of cases like habeas corpus cases.

[5]The Act references the parties by name, designates the forum for the dispute, sets a time limit on decision-making, and suspends previous judgments, all so that the federal judiciary is instructed as to how to conduct this specific case.

[6] I hasten to note that the provisions in Section 2 of the Act cannot be construed as limitations of the exercise of jurisdiction.  Section 1 of the Act grants jurisdiction; Section 2 purports to do more by directing the district court how to execute its judicial function.  Accordingly, the provisions of Section 2 cannot be saved by creating the fiction that they are permissible limitations on the exercise of federal jurisdiction under Sheldon v. Sill, 49 U.S. 441 (1850) and its progeny.

11

a nullity under the doctrine of nonseverability. "The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." New York v. United States, 505 U.S. 144, 186, 112 S. Ct. 2408, 2434 (1992) (internal quotations and citations omitted). In most cases where unconstitutional sections of a statute have been severed the legislation has contained a severability clause. See, e.g., INS, 462 U.S. at 932, 103 S. Ct. at 2774. The absence of a severability provision, however, should not be construed to create a presumption against severability. See New York, 505 U.S. at 186, 112 S. Ct. at 2434.

While the haste in which the Act was passed offered little time for the full development of congressional findings, a comprehensive review of the available legislative history surrounding the passage of the Act reveals that Congress manifestly would not have passed an act which allowed federal courts to give deference to State court findings or exercise its discretion to invoke abstention or exhaustion doctrines. See 151 CONG. REC. H1731 (daily ed. Mar. 20, 2005) (statements of Speaker Hastert (R-Ill.)) (referencing the availability of de novo review by noting that he supported the Act because it would allow the "case [to

be] tried anew where the judge can reevaluate and reassess [Mrs. Schiavo's] medical condition"); id. (statements of Rep. Stupak (D-Mich.)) (referencing the availability of the doctrines of State court waiver, abstention, and exhaustion by noting that the Act allows a federal judge to review the case "without being prejudiced by any of the information from the Florida State case"). Had this been their intent, a federal court could have frustrated their purpose to obtain a stay of the State court order. See 151 CONG. REC. S3100 (daily ed. Mar. 20, 2005) (statements of Majority Leader Frist (R-Tenn.)) (noting that in passing the legislation he "assume[d] . . . the Federal court would grant a stay based on the facts of this case because Mrs. Schiavo would need to be alive in order for the court to make its determination"). The United States Supreme Court has stated that the most "relevant inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress." Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 107 S. Ct. 1476, 1480 (1987). Here, in the absence of Section 2, a federal court could nullify congressional intent, and therefore the Act is not subject to severability. As such, the constitutional infirmity of Section 2 of the Act renders the entire Act a nullity. Thus, under the Act and the Rooker-Feldman doctrine, the district court lacked a jurisdictional basis to render its decision and we lack jurisdiction on appeal.

## C.     Conclusion

The separation of powers implicit in our constitutional design was created "to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility." INS, 462 U.S. at 951, 103 S. Ct. at 2784. But when the fervor of political passions moves the Executive and the Legislative branches to act in ways inimical to basic constitutional principles, it is the duty of the judiciary to intervene. *If sacrifices to the independence of the judiciary are permitted today, precedent is established for the constitutional transgressions of tomorrow.* See New York, 505 U.S. at 187, 112 S. Ct. at 2434. Accordingly, we must conscientiously guard the independence of our judiciary and safeguard the Constitution, even in the face of the unfathomable human tragedy that has befallen Mrs. Schiavo and her family and the recent events related to her plight which have troubled the consciences of many. Realizing this duty, I conclude that Pub. L. 109-3 is an unconstitutional infringement on core tenets underlying our constitutional system. Had Congress or the Florida legislature, in their *legislative* capacities, been able to constitutionally amend applicable law, we would have been constrained to apply that law. See Robertson v. Seattle Audobon Soc'y, 503 U.S. 429, 441, 112 S. Ct. 1407, 1414 (1992). By opting to pass Pub. L. 109-3 instead, however, Congress chose to overstep constitutional boundaries into the

14

province of the judiciary. Such an Act cannot be countenanced. Moreover, we are bound by the <u>Rooker-Feldman</u> doctrine not to exercise any other jurisdictional bases to override a final state judgment. Should the citizens of Florida determine that its law should be changed, it should be done legislatively. Were the courts to change the law, as the petitioners and Congress invite us to do, an "activist judge" criticism would be valid.

# APPENDIX

109th CONGRESS

1st Session

S. 686

For the relief of the parents of Theresa Marie Schiavo.

----------------------------------------------------------------------------

IN THE SENATE OF THE UNITED STATES

March 20, 2005

Mr. Frist (for himself, Mr. Martinez, and Mr. Santorum) introduced the following bill; which was read twice, considered, read the third time, and passed

----------------------------------------------------------------------------

AN ACT

For the relief of the parents of Theresa Marie Schiavo.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. RELIEF OF THE PARENTS OF THERESA MARIE SCHIAVO.

The United States District Court for the Middle District of Florida

16

shall have jurisdiction to hear, determine, and render judgment on a suit or claim by or on behalf of Theresa Marie Schiavo for the alleged violation of any right of Theresa Marie Schiavo under the Constitution or laws of the United States relating to the withholding or withdrawal of food, fluids, or medical treatment necessary to sustain her life.

SEC. 2. PROCEDURE.

Any parent of Theresa Marie Schiavo shall have standing to bring a suit under this Act. The suit may be brought against any other person who was a party to State court proceedings relating to the withholding or withdrawal of food, fluids, or medical treatment necessary to sustain the life of Theresa Marie Schiavo, or who may act pursuant to a State court order authorizing or directing the withholding or withdrawal of food, fluids, or medical treatment necessary to sustain her life. In such a suit, the District Court shall determine de novo any claim of a violation of any right of Theresa Marie Schiavo within the scope of this Act, notwithstanding any prior State court determination and regardless of whether such a claim has previously been raised, considered, or decided in State court proceedings.

17

The District Court shall entertain and determine the suit without any delay or abstention in favor of State court proceedings, and regardless of whether remedies available in the State courts have been exhausted.

SEC. 3. RELIEF.

After a determination of the merits of a suit brought under this Act, the District Court shall issue such declaratory and injunctive relief as may be necessary to protect the rights of Theresa Marie Schiavo under the Constitution and laws of the United States relating to the withholding or withdrawal of food, fluids, or medical treatment necessary to sustain her life.

SEC. 4. TIME FOR FILING.

Notwithstanding any other time limitation, any suit or claim under this Act shall be timely if filed within 30 days after the date of enactment of this Act.

SEC. 5. NO CHANGE OF SUBSTANTIVE RIGHTS.

Nothing in this Act shall be construed to create substantive rights not

otherwise secured by the Constitution and laws of the United States or of the several States.

SEC. 6. NO EFFECT ON ASSISTING SUICIDE.

Nothing in this act shall be construed to confer additional jurisdiction on any court to consider any claim related--

(1) to assisting suicide,

(2) a State law regarding assisting suicide.

SEC. 7. NO PRECEDENT FOR FUTURE LEGISLATION.

Nothing in this Act shall constitute a precedent with respect to future legislation, including the provision of private relief bills.

SEC. 8. NO EFFECT ON THE PATIENT SELF-DETERMINATION ACT OF 1990.

Nothing in this act shall affect the rights of any person under the Patient Self-Determination Act of 1990.

SEC. 9. SENSE OF THE CONGRESS.

It is the Sense of the Congress that the 109th Congress should consider policies regarding the status and legal rights of incapacitated individuals who are incapable of making decisions concerning the provision, withholding, or withdrawal of foods, fluid, or medical care.

CARNES and HULL, Circuit Judges, concurring in the denial of rehearing en banc.

We write briefly for the purpose of responding to Judge Tjoflat's opinion dissenting from the denial of rehearing en banc.

The plaintiffs' position concerning Count 8 of the amended complaint has been fluid throughout these proceedings. Judge Tjoflat's interpretation of their latest contention is that they are arguing there was insufficient evidence before the state courts to support by clear and convincing evidence the findings of those courts. As he understands the plaintiffs' latest arguments, "[t]he relevant question here is whether a rational factfinder could have found by clear and convincing evidence that Mrs. Schiavo would have wanted nutrition and hydration to be withdrawn under these circumstances." That is not the way we understand the arguments that the plaintiffs have put forward in their current suggestion for rehearing en banc. However, even if Judge Tjoflat's understanding of those arguments is correct and the question presented is the one he has articulated, this Court is correct in denying rehearing en banc.

Assuming, as Judge Tjoflat may, that the Due Process Clause requires clear and convincing evidence, there was abundant testimony before the state trial court

to prove by that evidentiary standard that Mrs. Schiavo would have wanted nutrition and hydration to be withdrawn under these circumstances. Some of that evidence is set out at some length in the trial court's detailed order of February 11, 2000. While there was some conflict in the evidence, credibility determinations are within the province of the factfinder. See Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985) (special deference is due where a trial court's findings are based on the credibility of witnesses, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"); Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 856, 102 S. Ct. 2182, 2189 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact."); United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) ("Such a credibility finding is within the province of the factfinder."). It is not the role of an appellate court to second-guess credibility determinations.

On appeal from the state trial court's decision and findings, Florida's Second District Court of Appeal did carefully review the record and determined that the question the trial court decided:

> was whether Theresa Marie Schindler Schiavo, not after
> a few weeks in a coma, but after ten years in a persistent
> vegetative state that has robbed her of most of her

> cerebrum and all but the most instinctive of neurological functions, with no hope of a medical cure but with sufficient money and strength of body to live indefinitely, would choose to continue the constant nursing care and the supporting tubes in hopes that a miracle would somehow recreate her missing brain tissue, or whether she would wish to permit a natural death process to take its course and for her family members and loved ones to be free to continue their lives. After due consideration we conclude that the trial judge had clear and convincing evidence to answer this question as he did.

In re Guardianship of Schiavo, 780 So. 2d 176, 180 (Fla. 2d DCA 2001).

Even assuming that this type of sufficiency of the evidence issue is a proper one for an en banc determination, there is no substantial question in this case about whether a rational factfinder could have found, as the Florida court did, that there was clear and convincing evidence that Mrs. Schiavo would not have wanted nutrition and hydration continued in these circumstances. Given the credibility determinations that the state trial court was authorized to and did make, the evidence clearly was sufficient to meet the clear and convincing evidence standard, which the Florida courts had imposed and did apply in this case.

TJOFLAT, Circuit Judge, dissenting from the denial of rehearing en banc, in which WILSON, Circuit Judge, joins:

I.

I would grant rehearing en banc. So that we can consider the merits of this appeal, I would direct the district court to issue an injunction under the All Writs Act, 28 U.S.C. § 1651(a). Otherwise the appeal will become moot. See Schiavo v. Schiavo, __ F.3d __, 2005 WL 665257 (11th Cir. Mar. 23, 2005) (Tjoflat, J., dissenting from the denial of rehearing en banc).[1]

The plaintiffs have now stated a plausible claim that the Due Process Clause of the Fourteenth Amendment requires clear and convincing evidence of an individual's wishes before a state court may order withdrawal of life-sustaining nutrition, hydration, or other medical attention.[2] See generally Cruzan v. Missouri

---

[1] The panel in its first opinion on this matter appears to have conflated injunctive relief under the All Writs Act, which has nothing to do with the merits of an appeal, with an ordinary preliminary injunction, which requires a showing of a substantial likelihood of success on the merits. See Schiavo v. Schiavo, __ F.3d __, 2005 WL 648897 (11th Cir. Mar. 23, 2005).

[2] While I think that the plaintiffs have stated a plausible claim, I am not certain they will succeed on the merits. One reason for my uncertainty is the hurried pace of this litigation. To give the plaintiffs claims the reasoned attention they deserve, and to develop the certainty the law demands, we should rehear this case en banc. The United States Supreme Court encourages such caution in life-and-death situations, such as in its federal habeas jurisprudence. The Court has said that "[i]f the district court cannot dismiss the petition on the merits before the scheduled execution, its is obligated to address the merits and must issue a stay to prevent the case from becoming moot" when the prisoner dies. Lonchar v. Thomas, 517 U.S. 314, 320 (1996).

24

<u>Dep't of Health</u>, 497 U.S. 261 (1990) (holding that a state <u>may</u> require clear and convincing evidence of an incompetent's wishes to the withdrawal of life-sustaining treatment); <u>Santosky v. Kramer</u>, 445 U.S. 745 (1982) (holding that a state <u>must</u> support allegations of neglect by clear and convincing evidence before it may terminate parental rights); <u>Addington v. Texas</u>, 441 U.S. 418 (1979) (holding that the clear and convincing evidence standard is required in civil commitment proceedings).  If such a right exists, it is not enough to simply say that the state statute does, in fact, require clear and convincing evidence.

In <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), a collateral attack on a state-court criminal conviction, the state trial court had stated that it was applying the constitutionally required reasonable doubt standard, but the defendant argued that his constitutional rights were nonetheless violated because there was insufficient evidence in the record for a rational factfinder to convict him under that standard. The Court agreed and held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319.  Similarly, in the case at hand, while it is clear that the state court

---

Similarly, because the plaintiffs have stated a plausible claim, we should issue an injunction to avoid the case from becoming moot when Mrs. Schiavo perishes.

purported to use the clear and convincing evidence standard, the plaintiffs argue that there is simply insufficient evidence to support its findings under that standard. The relevant question here is whether a rational factfinder could have found by clear and convincing evidence that Mrs. Schiavo would have wanted nutrition and hydration to be withdrawn under these circumstances. The plaintiffs carry a heavy burden, but I do not believe that this question can be determined in this expedited fashion without a hearing on the merits.[3]

Thus, "we certainly cannot say that [the plaintiffs have] no likelihood of prevailing on the merits. As long as this factor is present to some degree, it is not even necessary that a substantial likelihood of success be shown. Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co., 621 F.2d 683, 686 (5th Cir. 1980).[4] The other factors are strong in this case. See Schiavo v. Schiavo, __ F.3d __, 2005 WL 648897, at *17-

---

[3] Judges Carnes and Hull are firmly convinced that "the evidence clearly was sufficient to meet the clear and convincing evidence standard, which the Florida courts had imposed and did apply in this case." Ante, at 23. My contention is that we cannot make this determination now. Instead, the district court should make this determination only after a full and careful review of the evidence, which cannot occur under current time constraints.

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

18 (11th Cir. Mar. 23, 2005) (Wilson, J., dissenting).  Accordingly, I would grant a preliminary injunction.

## II.

Judge Birch now argues that this court lacks jurisdiction to entertain this case due to constitutional infirmities in the legislation enabling federal review of this case.  In particular, he identifies four provisions of the act that "constitute legislative dictation of how a federal court should exercise its judicial functions."  Ante, at 9.  I believe that it is fully within Congress's power to dictate standards of review and to waive in specific cases nonconstitutional abstention doctrines.  Indeed, if Congress cannot do so, the fate of hundreds of federal statutes would be called into serious question.  I wish to dispel any questions about our jurisdiction in this case.

Under Article III, Congress has the power both to establish federal courts and, except as to the original jurisdiction of the Supreme Court, to make exceptions and regulations as to their jurisdiction.  U.S. Const. art. III.  The Supreme Court has recognized, at least in some contexts, that Congress also has the power to require federal courts to entertain causes of action they would not otherwise have entertained for prudential reasons.  Cf. Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing

27

requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing. . . . We acknowledge, though, that Congress' decision to grant a particular plaintiff the right to challenge an Act's constitutionality . . . eliminates any prudential standing limitations and significantly lessens the risk of unwanted conflict with the Legislative Branch when that plaintiff brings suit." (citation omitted)).

This is not a case, to use separation-of-powers parlance, of Congress "arrogating" power to itself, nor is it a case in which one branch of government has "impair[ed] another in the performance of its constitutional duties." Loving v. United States, 517 U.S. 748, 757 (1996) (emphasis added). Instead, Congress has prescribed a particular approach to a particular problem in the general domain of federal jurisdiction, without presuming to dictate—in any respect—our performance of a court's essential function: "to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803) (Marshall, C.J.). It is in this domain that the Supreme Court has jealously guarded our power against intrusion by Congress. See, e.g., Dickerson v. United States, 530 U.S. 428, 432 (2000) ("We hold that Miranda, being a constitutional decision of this Court, may not be in effect overruled by an Act of Congress, and we decline to overrule Miranda ourselves. We therefore hold that Miranda and its progeny in this Court govern the

admissibility of statements made during custodial interrogation in both state and

federal courts.").

Here, Congress has attempted only what has long been established to be

within its power to dictate: our standard of review,[5] the effect of a prior state court

judgment on that review,[6] the application of prudential abstention doctrines,[7] and

---

[5] Judge Birch attempts to define standards of review as "rules of decision," but I find no basis for this in the case law. The rules Congress has established here go to the extent of our authority to assess the merits of <u>claims</u>, without authorizing any new claims or elements thereof to guide our determination of federal questions. As such, Congress's rules are jurisdictional in nature. <u>See, e.g.</u>, <u>Sosa v. Alvarez-Machain</u>, ___ U.S. ___, 124 S. Ct. 2739, 2755 (2004) ("Nor would the distinction between jurisdiction and cause of action have been elided by the drafters of the [Judiciary] Act or those who voted on it. As Fisher Ames put it, 'there is a substantial difference between the jurisdiction of courts and rules of decision.' 1 Annals of Cong. 807 (Gales ed. 1834).").

Furthermore, to hold that Congress may not establish nor alter standards of review would wreak havoc on dozens of federal statutes that do just that in numerous contexts. <u>See, e.g.</u>, 5 U.S.C. § 552 (providing for de novo review of federal agency determinations of fees for requests of records of notice and comment proceedings).

Of course, the habeas corpus statutes are a subset of this string of cases. Section 2254 review, in particular, prescribes not just any standard of review, but one regarding the degree of deference to be afforded final state adjudications. 28 U.S.C. § 2254(d).

[6] Indeed, leaving aside whatever effect this might have on our abstention doctrines—which I deal with in note 7, <u>infra</u>—de novo review of state determinations of <u>federal</u> questions seems consonant with traditional relations between federal and state courts, particularly in light of the fact that Congress need not vest the power to adjudicate federal questions <u>at all</u> in state courts in the first place. <u>See</u> <u>Martin v. Hunter's Lessee</u>, 14 U.S. (1 Wheat.) 304, 336-37 (1816) (Story, J.) ("At all events, whether the one construction or the other prevail, it is manifest that the judicial power of the United States is unavoidably, in some cases, exclusive of all state authority, and in all others, may be made so at the election of congress."). Separate questions might arise if, upon reviewing the merits of the case, we determined that the parties had called upon the district court to review a state court judgment of state law. <u>See</u> <u>Murdock v. Memphis</u>, 87 U.S. (20 Wall.) 590, 625-28 (1875).

[7] In fact, the abstention doctrine applicable in this case—the so-called <u>Rooker-Feldman</u> doctrine—does not even rise to the level of "prudential," <u>i.e.</u>, court-made, doctrine. Although

29

the effect of exhaustion requirements.[8] I know of no case barring Congress from so dictating, and Judge Birch does not cite any. Indeed, quite to the contrary, Judge Birch cites cases establishing that both our abstention and exhaustion doctrines are prudential. See ante, at 10. If none of these dictates by itself goes beyond Congress's power to determine the jurisdiction of federal courts, I know of no doctrine that could convert their aggregation into a separation-of-powers violation.

---

Judge Birch describes this doctrine as "jurisdictional," he concedes as he must that "there exists an exception to Rooker-Feldman when a federal statute authorizes federal appellate review of final state court decisions." See ante, at 4 n.3. That is because Rooker did not establish a constitutional (or even prudential) bar to federal review of final state court decisions; instead, it recognized a statutory bar to such review. See Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923) ("Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the judgment for errors of that character. Judicial Code, § 237, as amended by Act Sept. 6, 1916, c. 448, § 2, 39 Stat. 726 (Comp. St. § 1214). To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original." (emphasis added)); cf. Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 644 n.3 (2002) ("The Rooker-Feldman doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to this Court, see § 1257(a). The doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency."). Thus, it was completely within Congress's power to make an exception to the general rule regarding the power of the district courts to review final state court decisions, and it is clear from the face of the statute that Congress intended to do so. Judge Birch does not explain why, under these circumstances, it is of any moment whether Congress provided such an exception in the body of the Americans with Disabilities Act or the Rehabilitation Act of 1973.

[8] Congress's authority over exhaustion requirements was recognized in Patsy v. Board of Regents of Florida, 457 U.S. 496, 513 (1982) ("[P]olicy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent." (emphasis added)).