BENTON, J.,
dissenting.
The school teachers who sought declaratory and injunctive relief below, and now bring this appeal, contend that the Legislature, in enacting Chapter 2011-1, Laws of Florida, now codified at section 1012.34(8), Florida Statutes (2014), has conferred on the State Board of Education power to designate some of them — perhaps nearly all of them — professionally “unsatisfactory,” and therefore, among other things, subject to being laid off, for reasons that are so unclear and indefinite that the Legislature has abandoned its responsibility to set public policy in this important area, and delegated legislative authority it should have exercised itself to the State Board of Education, an executive branch agency. I agree with this contention, and respectfully dissent from today’s decision on that basis.
Quite apart from the troubling implications for numerous public employee collective bargaining agreements,[6] the appellants contend and I agree that subsection 8, the provision the teachers challenge as essentially standardless, offers no meaningful guidance on how the State Board of Education is to determine “uniform cut scores,” section 1012.34(8), Fla. Stat. (2014), and in particular on how “student learning growth” (as defined elsewhere in section 1012.34) or other student performance measurements are to be taken into account in arriving at an individual edu *598 cator’s score.[7] While the statute does say that half[8] of each educator’s evaluation is to be based on “student learning growth” under some unspecified, brave new scheme, § 1012.34(3)(a)l, Fla. Stat. (2014), it is anybody’s guess what the Legislature intended in this regard, or what the State Board of Education could or must do to comply with the pertinent statutory language. Not every provision of section 1012.34 is under challenge here: At issue is only subsection 8, which lacks any standard for setting “uniform cut scores.”
The teachers challenge the Legislature’s delegation to state educational administrators of purported authority to adopt rules that “establish student performance levels that if not met will result in the [instructional] employee receiving an unsatisfactory performance evaluation rating,” § 1012.34(8), and so become subject to discharge and be referred for possible license (teacher’s certificate) revocation. The teachers do not base the present challenge on the questionable fairness of firing teachers because some or all of their students fail to do well on tests. Their challenge is based instead on the Legislature’s handing off to the state educational bureaucracy power to adopt rules, wholly as it sees fit, that might lead to ninety percent of Florida’s public school teachers’ losing their jobs. Of course, it might be only ten percent. But the gist of the challenge is that nothing in the law determines whether it will be ninety percent or ten percent, or how the bureaucracy should settle that question. Subsection 8 leaves the decision to the uncabined discretion of the State Board of Education, and a reviewing court can have no better idea than the State Board will have whether subsection 8, calls for ten percent or for ninety percent, or some other percentage entirely.
• Subsection 8 requires that the State Board of Education adopt rules, in conformity with the Administrative Procedure Act, establishing uniform procedures for teacher evaluation systems that differentiate among four levels of performance (identified elsewhere[9] in section 1012.34), to wit: “Highly effective,” “Effective,” “Needs improvement” (or in the first three years of employment, “developing”), and “Unsatisfactory.” § 1012.34(2)(e), Fla. Stat. (2014). For each performance level, *599 the State Board of Education must establish “uniform cut scores”:
The State Board of Education shall adopt rules ... which establish ... specific, discrete standards for each performance level required under subsection (2) to ensure clear and sufficient differentiation in the performance levels and to provide consistency in meaning across school districts.... Specifically, the rules shall establish student performance levels that if not met will result in the employee receiving an unsatisfactory performance evaluation rating. In like manner, the rules shall establish a student performance level that must be met in order for an employee to receive a highly effective rating and a student learning growth standard that must be met in order for an employee to receive an effective rating.
§ 1012.34(8), Fla. Stat. (2014). Virtually automatic, but highly important, consequences would flow from these performance level rating scores: Performance evaluation ratings would determine, for example, an individual educator’s eligibility for salary increases, promotions, placements and transfers, not to mention the likelihood of an individual educator’s being dismissed.[10],[11] See §§ 1012.22(l)(c); 1012.22(l)(e); 1012.28(6); 1012.33(5), Fla. Stat. (2014).
Clearly germane here is a key rationale underlying the constitutional separation of powers in state and federal government alike, which now Judge Boyd explained, as follows:
*600 The United States and Florida constitutions require at least a majority vote of both houses of a representative legislative body and the approval of the chief executive as a prerequisite to adoption of public policy. This significant hurdle is not simply a matter of parliamentary procedure. The procedure reflects a profound understanding that, in the long run, a government that acts to implement policies' unsupported by general consensus ceases to be a democracy and will eventually become unstable. The process was not designed to be efficient, but to achieve other goals, one of which was to prevent the adoption of controversial policies not enjoying broad public support. Delegation of the power to make policy decisions from a democratically elected legislative branch to any entity able to act in the absence of consensus reduces the power of democratic institutions and divorces the government from the people.
F. Scott Boyd, Legislative Checks on Rule-making Under Florida’s New APA, 24 Fla. St. U. L. Rev. 309, 316 (1997) (footnotes omitted).
In contrast to the Federal Constitution, moreover, Article II, section 3 of the Constitution of Florida has been construed to require what is universally acknowledged to be a strict separation of powers. Art. 11, § 3, Fla. Const.; Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004); see also Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991).[12] Where the Florida Constitution allocates power to a specific branch of government, any statute purporting to give the same power to another branch violates the separation of powers doctrine.
[Ujnlike the apparent federal approach, Florida has not relied on implied powers, arguments of expedience or necessity, or any penumbral theory in gauging the contours of the separation of powers ... What the Constitution’s plain language says on this subject is what the courts of Florida enforce. If a statute purports to give one branch powers textually assigned to another by the Constitution, then that statute is unconstitutional.
B.H. v. State, 645 So.2d 987, 992 (Fla.1994); cf. Harden v. Garrett, 483 So.2d 409, 410 (Fla.1985) (concluding constitutional delegation of power to the Legislature prevents the judiciary, under the separation of powers doctrine, from deciding a legislative election contest). The Florida Supreme Court has applied this strict separation of powers doctrine rigorously and recently. See, e.g., Fla. Dep’t of State, Div. of Elections v. Martin, 916 So.2d 763, 769 (Fla.2005); Schiavo, 885 So.2d at 329 (describing the separation of powers as the “cornerstone of American democracy”).[13]
*601 Whether the Legislature “intended to violate the separation of powers requirement of Article II, section 3 of the Florida Constitution,” ante at 2, is not the issue. The Legislature has in fact violated Article II, section 3, by omitting sufficient guidelines from subsection 8. “The requirement that the Legislature provide sufficient guidelines also ensures the availability of meaningful judicial review.” Schiavo, 885 So.2d at 332.
“In the final analysis it is the courts, upon a challenge to the exercise or non-exercise of administrative action, which must determine whether the administrative agency has performed consistently with the mandate of the legislature. When legislation is so lacking in guidelines that neither the agency nor the courts can determine whether the agency is carrying out the intent of the legislature in its conduct, then, in fact, the agency becomes the lawgiver rather than the administrator of the law.”
Id. (quoting Askew v. Cross Key Waterways, 372 So.2d 913, 918-19 (Fla.1978)); see also Sloban v. Fla. Bd. of Pharmacy, 982 So.2d 26, 30 (Fla. 1st DCA 2008) (same). Florida courts “have recognized that the ‘specificity of the guidelines [set forth in the legislation] will depend on the complexity of the subject and the “degree of difficulty involved in articulating finite standards,” ’ ” [but] have also made clear that “[e]ven where a general approach would be more practical than a detailed scheme of legislation, enactments may not be drafted in terms so general and unre-strictive that administrators are left without standards for the guidance of their official acts.” Schiavo, 885 So.2d at 332-33 (citations omitted).
Despite some statutory detail concerning methods for measuring “student learning growth” and considerable detail about the high stakes consequences of overall performance ratings for individual educators (including school administrators), subsection 8 is altogether silent on how the State Board of Education is to make use of “student learning growth” or other student assessments to “establish student performance levels that if not met will result in the [instructional] employee receiving an un *602 satisfactory performance evaluation rating.” § 1012.34(8), Fla. Stat. (2014). The Legislature has delegated significant policy decisions to the State Board of Education with no guidance on how they are to be made, and no standard for the Board or a reviewing court to ascertain whether legislative intent is being fulfilled. See generally Orr v. Trask, 464 So.2d 131, 134-35 (Fla.1985) (holding that, although “it was not necessary for the legislature to make the actual selection of the deputy positions to be abolished; it was ... necessary that the legislature furnish ascertainable minimal criteria and guidelines on how the selection was to be made”).
Fitting hand and glove with Florida’s strict separation of powers doctrine, amendments to the Administrative Procedure Act (APA) in recent years make clear that the rulemaking authority subsection 8 confers on the State Board of Education cannot remedy the constitutional defects in the statutory language challenged here. It is by no means clear that the State Board of Education itself is persuaded that subsection 8 provides the Board adequate legislative guidance for promulgating rules. The challenged language has been in place since 2011,[14] yet no rule implementing subsection 8 has ever been adopted.
In the stalled rule adoption process, the Board of Education seemed to be searching for answers to key questions the Legislature neglected to address. As part of the rule development workshops undertaken in a thus far unsuccessful attempt to implement subsection 8, the Department of Education poses to workshop participants the precise, critical, policy question that *603 should have been answered by the legislation, to wit: “What standard should be used to evaluate and classify teachers and administrators based on VAM data?” Fla. Dep’t of Ed., Rule Development Workshop Proposed Rule 6A-5.04.il: Calculations of Student Learning Growth Using Statewide Assessment Data for Use in School Personnel Evaluations, p. 16, available at http://www.fldoe.Org/core/fileparse.p hp/ 7566/urlt/0075066-vam-ruleworkshop.pdf (last visited Jan. 6, 2015). Albeit arcanely articulated[15] by those charged with drafting a rule to implement subsection 8, this is the basic issue the Legislature left to the executive branch without any basis for deciding it. If the statute itself had provided adequate guidance for answering this question, as required by the Florida Constitution, the Department would not have needed to ask agency staff and members of the public to supply the answer.
Beginning in 1996,[16] “amendments to the APA have tightened and clarified rulemak-ing restrictions.” State, Bd. of Trs. of the Internal Improvement Trust Fund v. Day *604 Cruise Ass’n, Inc., 794 So.2d 696, 698 (Fla. 1st DCA 2001).[17] As revised in 1999, the closing paragraph of section 120.52(8) provides:
A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious or is within the agency’s class of powers and duties, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific powers and duties conferred by the same statute.
§ 120.52(8), Fla. Stat. (1999) (emphasis supplied); see also Ch. 99-379, § 2, at 3790-91, Laws of Fla.[18] “Under the 1996 *605 and 1999 amendments to the APA, it is now clear, agencies have rulemaking authority only where the Legislature has enacted a specific statute, and authorized the agency to implement it, and then only if the (proposed) rule implements or interprets specific powers or duties, as opposed to improvising in an area that can be said to fall only generally within some class of powers or duties the Legislature has conferred on the agency.” Day Cruise Ass’n, 794 So.2d at 700 (footnote omitted).
Particularly in light of these changes to the Administrative Procedure Act,[19] the majority and concurring opinions’ reliance on Florida Teaching Profession-National Education Association v. Turlington, 490 So.2d 142 (Fla. 1st DCA 1986), is wholly unjustified.[20] Concluding that there was *606 no unlawful delegation of legislative authority to the Department of Education, the Turlington court relied (at least with regard to the Master Teacher Program) in large part on rules promulgated by the Board to “ ‘adequately protect candidates ... from the arbitrary exercise of discretion,”’ saying that Department of Education officials were “ ‘responsible for fleshing out these programs’ ” by rulemak-ing and predicting that even “ ‘[mjore fine tuning [would] be required.’ ” Id. at 146-47. It is now crystal clear, if there were ever any doubt,[21] that executive branch rulemaking cannot save a statute that im-permissibly delegates legislative authority. See F. Scott Boyd, Legislative Checks on Rulemaking Under Florida’s New APA, 24 Fla. St. U.L. Rev. 309, 317 n. 59 (“While the nondelegation doctrine and the APA share certain policy goals, ... [the] constitutionality of a statute [does not depend on] anything that takes place [post enactment]: the way the statute may be implemented by an agency; the enactment, amendment, or repeal of an APA; *607 or the extent to which the statute was ‘refined’ through rulemaking.”). In any event, it appears that the Turlington plaintiffs’ argument[22] that the Master Teacher Program at issue there represented an “ ‘unlawful, standardless delegation of legislative authority’ ” was based solely on the claim that “-‘the ability of principals to confer extra evaluation points on teachers represented] unlawful discretion.’ ” Turlington, 490 So.2d at 145-46. The possibility of missing out on special recognition under the scheme at issue in Turlington because of the lack of a principal’s recommendation is a world apart from the draconian consequences of falling on the wrong side of the “uniform cut scores” required by subsection 8.
To return to the specifics of the present case, subsection 1012.34(2) sets forth some general requirements for evaluation systems: that such systems be designed to support “effective instruction” and student learning growth; that the systems provide “appropriate” instruments, procedures and criteria for “continuous quality improvement” of professional skills; that systems include a mechanism to examine performance data from multiple sources, including “opportunities for parents to provide input” into employee performance evaluations “when appropriate;” and that [school] systems identify those teaching fields for which special evaluation procedures and criteria are necessary. § 1012.34(2), Fla. Stat. (2014). In addition,[23] subsection 1012.34(2) provides that evaluation systems must differentiate among four levels of performance (highly effective, effective, needs improvement, or unsatisfactory).
But neither subsection 2 nor any other subsection directs, guides, or informs the State Board of Education how it is to decide on “student performance levels” or a “student learning growth standard” “that if not met will result in the employee receiving an unsatisfactory performance evaluation rating” (or that must be met for an employee to receive a “highly effective” or “effective” rating) as mandated by subsection 8. § 1012.34(8), Fla. Stat. (2014). See D’Alemberte v. Anderson, 349 So.2d 164, 167-68 (Fla.1977) (holding that the statute did “not employ technical words *608 which have acquired a pellucid connotation to those specific individuals governed by the statute,” that it was not “ ‘suggested what standards, either by common usage or by reference to the purposes of the Act, c[ould] be implied in limiting the Commissioner’s authority in this respect,”’ and that vesting a Commission with the “ ‘unbridled discretion to define such terms without any rule or standard whatever to guide them [was] a clear delegation ... of straight legislative power which will not be permitted’ ” (quoting Conner v. Joe Hatton, Inc., 216 So.2d 209, 218 (Fla.1968))).
Subsection 8 “includes no criteria which provide standards to guide the [State Board of Education] in the exercise of the power delegated.” See Dep’t of State, Div. of Elections v. Martin, 885 So.2d 453, 458 (Fla. 1st DCA 2004). Subsection 8 leaves it to the Board to determine what it should consider in establishing a “student performance level” that will trigger a mandatory evaluation of “unsatisfactory,” with the dire consequences statutorily attendant. The Board is free to choose “trigger points” in a way that labels a majority of teachers “highly effective,” “unsatisfactory,” or anything in between. This lack of legislative guidance and restraint renders subsection 8 unconstitutional. See B.H., 645 So.2d at 998-94 (“The legislature may not delegate open-ended authority such that ‘no one can say with certainty, from, the terms of the law itself, what would be deemed an infringement of the law.’ ”); Sloban, 982 So.2d at 31 (holding section 456.072(6), Florida Statutes, granted “unbridled .discretion” to the Florida Board of Pharmacy “to determine the professional fate of a group of persons”); see also Cross Key Waterways, 372 So.2d at 918-19 (“When legislation is so lacking in guidelines that neither the agency nor the courts can determine whether the agency is carrying out the intent of the legislature in its conduct, then, in fact, the agency becomes the lawgiver rather than the administrator of the law.”).
Subsection 1012.34(8) is an unconstitutional delegation of legislative authority, a violation of the separation of powers required by article II, section 3 of the Florida Constitution. The judgment as to Count VI of the amended complaint should be reversed, and the case should be remanded for further proceedings.

Appendix

1012.34. Personnel evaluation procedures and criteria[24]
(1) Evaluation system approval and reporting.—
(a) For the purpose of increasing student learning growth by improving the quality of instructional, administrative, and supervisory services in the public schools of the state, the district school superintendent shall establish procedures for evaluating the performance of duties and responsibilities of all instructional, administrative, and supervisory personnel employed by the school district. The district school superintendent shall annually report the evaluation results of instructional personnel and school administrators to the Department of Education in addition to the information required under subsection (5).
(b) The department must approve each school district’s instructional personnel and school administrator evaluation systems. The department shall monitor each district’s implementation of its instructional personnel and school administrator evaluation systems for compliance with the requirements of this section.
*609 (c)By December 1, 2012, the Commissioner of Education shall report to the Governor, the President of the Senate, and the Speaker of the House of Representatives the approval and implementation status of each school district’s instructional personnel and school administrator evaluation systems. The report shall include performance evaluation results for the pri- or school year for instructional personnel and school administrators using the four levels of performance specified in paragraph (2)(e). The performance evaluation results for instructional personnel shall be disaggregated by classroom teachers, as defined in s. 1012.01(2)(a), excluding substitute teachers, and all other instructional personnel, as defined in s. 1012.01(2)(b)-(d). The commissioner shall continue to report, by December 1 each year thereafter, each school district’s performance evaluation results and the status of any evaluation system revisions requested by a school district pursuant to subsection (6).
(2) Evaluation system requirements.— The evaluation systems for instructional personnel and school administrators must:
(a) Be designed to support effective instruction and student learning growth, and performance evaluation results must be used when developing district and school level improvement plans.
(b) Provide appropriate instruments, procedures, and criteria for continuous quality improvement of the professional skills of instructional personnel and school administrators, and performance evaluation results must be used when identifying professional development.
(c) Include a mechanism to examine performance data from multiple sources, including opportunities for parents to provide input into employee performance evaluations when appropriate.
(d) Identify those teaching fields for which special evaluation procedures and criteria are necessary.
(e) Differentiate among four levels of performance as follows:
1. Highly effective.
2. Effective.
3. Needs improvement or, for instructional personnel in the first 3 years of employment who need improvement, developing.
4. Unsatisfactory.
The Commissioner of Education shall consult with experts, instructional personnel, school administrators, and education stakeholders in developing the criteria for the performance levels.
(f) Provide for training programs that are based upon guidelines provided by the department to ensure that all individuals with evaluation responsibilities understand the proper use of the evaluation criteria and procedures.
(g) Include a process for monitoring and evaluating the effective and consistent use of the evaluation criteria by employees with evaluation responsibilities.
(h) Include a process for monitoring and evaluating the effectiveness of the system itself in improving instruction and student learning.
In addition, each district school board may establish a peer assistance process. This process may be a part of the regular evaluation system or used to assist employees placed on performance probation, newly hired classroom teachers, or employees who request assistance.
(3) Evaluation procedures and criteria. — Instructional personnel and school administrator performance evaluations must be based upon the performance of students assigned to their classrooms or schools, as provided in this section. Pur *610 suant to this section, a school district’s performance evaluation is not limited to basing unsatisfactory performance of instructional personnel and school administrators solely upon student performance, but may include other criteria approved to evaluate instructional personnel and school administrators’ performance, or any combination of student performance and other approved criteria. Evaluation procedures and criteria must comply with, but are not limited to, the following:
(a) A performance evaluation must be conducted for each employee at least once a year, except that a classroom teacher, as defined in s. 1012.01(2)(a), excluding substitute teachers, who is newly hired by the district school board must be observed and evaluated at least twice in the first year of teaching in the school district. The performance evaluation must be based upon sound educational principles and contemporary research in effective educational practices. The evaluation criteria must include:
1. Performance of students. — At least 50 percent of a performance evaluation must be based upon data and indicators of student learning growth assessed annually by statewide assessments or, for subjects and grade levels not measured by statewide assessments, by school district assessments as provided in s. 1008.22(8). Each school district must use the formula adopted pursuant to paragraph (7)(a) for measuring student learning growth in all courses associated with statewide assessments and must select an equally appropriate formula for measuring student learning growth for all other grades and subjects, except as otherwise provided in subsection (7).
a.For classroom teachers, as defined in s. 1012.01(2)(a), excluding substitute teachers, the student learning growth portion of the evaluation must include growth data for students assigned to the teacher over the course of at least 3 years. If less than 3 years of data are available, the years for which data are available must be used and the percentage of the evaluation based upon student learning growth may be reduced to not less than 40 percent.
b. For instructional personnel who are not classroom teachers, the student learning growth portion of the evaluation must include growth data on statewide assessments for students assigned to the instructional personnel over the course of at least 3 years, or may include a combination of student learning growth data and other measurable student outcomes that are specific to the assigned position, provided that the student learning growth data accounts for not less than 30 percent of the evaluation. If less than 3 years of student growth data are available, the years for which data are available must be used and the percentage of the evaluation based upon student learning growth may be reduced to not less than 20 percent.
c. For school administrators, the student learning growth portion of the evaluation must include growth data for students assigned to the school over the course of at least 3 years. If less than 3 years of data are available, the years for which data are available must be used and the percentage of the evaluation based upon student learning growth may be reduced to not less than 40 percent.
2. Instructional practice. — Evaluation criteria used when annually observing classroom teachers, as defined in s. 1012.01(2)(a), excluding substitute teachers, must include indicators based upon each of the Florida Educator Accomplished Practices adopted by the State Board of Education. For instructional personnel who are not classroom teachers, evaluation criteria must be based upon *611 indicators of the Florida Educator Accomplished Practices and may include specific job expectations related to student support.
3. Instructional leadership. — For school administrators, evaluation criteria must include indicators based upon each of the leadership standards adopted by the State Board of Education under s. 1012.986, including performance measures related to the effectiveness of classroom teachers in the school, the administrator’s appropriate use of evaluation criteria and procedures, recruitment and retention of effective and highly effective classroom teachers, improvement in the percentage of instructional personnel evaluated at the highly effective or effective level, and other leadership practices that result in student learning growth. The system may include a means to give parents and instructional personnel an opportunity to provide input into the administrator’s performance evaluation.
4. Professional and job responsibili- ■ ties. — For instructional personnel and school administrators, other professional and job responsibilities must be included as adopted by the State Board of Education. The district school board may identify additional professional and job responsibilities.
(b) All personnel must be fully informed of the criteria and procedures associated with the evaluation process before the evaluation takes place.
(c) The individual responsible for supervising the employee must evaluate the employee’s performance. The evaluation system may provide for the evaluator to consider input from other personnel trained under paragraph (2)(f). The evaluator must submit a written report of the evaluation to the district school superintendent for the purpose of reviewing the employee’s contract. The evaluator must submit the written report to the employee no later than 10 days after the evaluation takes place. The evaluator must discuss the written evaluation report with the employee. The employee shall have the right to initiate a written response to the evaluation, and the response shall become a permanent attachment to his or her personnel file.
(d)The evaluator may amend an evaluation based upon assessment data from the current school year if the data becomes available within 90 days after the close of the school year. The evaluator must then comply with the procedures set forth in paragraph (c).
[[Image here]]
(7) Measurement of student learning growth.—
(a) By June 1, 2011, the Commissioner of Education shall approve a formula to measure individual student learning growth on the Florida Comprehensive Assessment Test (FCAT) administered under s. 1008.22(3)(c)l. The formula must take into consideration each student’s prior academic performance. The formula must not set different expectations for student learning growth based upon a student’s gender, race, ethnicity, or socioeconomic status. In the development of the formula, the commissioner shall consider other factors such as a student’s attendance record, disability status, or status as an English language learner. The commissioner shall select additional formulas as appropriate for the remainder of the statewide assessments included under s. 1008.22 and continue to select formulas as new assessments are implemented in the state system. After the commissioner approves the formula to measure individual student learning growth on the FCAT and as additional formulas are selected by the com *612 missioner for new assessments implemented in the state system, the State Board of Education shall adopt these formulas by rule.
(b) Beginning in the 2011-2012 school year, each school district shall measure student learning growth using the formula approved by the commissioner under paragraph (a) for courses associated with the FCAT. Each school district shall implement the additional student learning growth measures selected by the commissioner under paragraph (a) for the remainder of the statewide assessments included under s. 1008.22 as they become available. Beginning in the 2014-2015 school year, for grades and subjects not assessed by statewide assessments but otherwise assessed as required under s. 1008.22(8), each school district shall measure student learning growth using an equally appropriate formula. The department shall provide models for measuring student learning growth which school districts may adopt.
(c) For a course that is not measured by a statewide assessment, a school district may request, through the evaluation system approval process, to use a student achievement measure rather than a student learning growth measure if achievement is demonstrated to be a more appropriate measure of classroom teacher performance. A school district may also request to use a combination of student learning growth and achievement, if appropriate.
(d) If the student learning growth in a course is not measured by a statewide assessment but is measured by a school district assessment, a school district may request, through the evaluation system approval process, that the performance evaluation for the classroom teacher assigned to that course include the learning growth of his or her students on FCAT Reading or FCAT Mathematics. The request must clearly explain the rationale supporting the request. However, the classroom teacher’s performance evaluation must give greater weight to student learning growth on the district assessment.
(e)For classroom teachers of courses for which the district has not implemented appropriate assessments under s. 1008.22(8) or for which the school district has not adopted an equally appropriate measure of student learning growth under paragraphs (b)-(d), student learning growth must be measured by the growth in learning of the classroom teacher’s students on statewide assessments, or, for courses in which enrolled students do not take the statewide assessments, measurable learning targets must be established based upon the goals of the school improvement plan and approved by the school principal. A district school superintendent may assign to instructional personnel in an instructional team the student learning growth of the instructional team’s students on statewide assessments. This paragraph expires July 1, 2015.
(8) Rulemaking. — The State Board of Education shall adopt rules pursuant to ss. 120.536(1) and 120.54 which establish uniform procedures for the submission, review, and approval of district evaluation systems and reporting requirements for the annual evaluation of instructional personnel and school administrators; specific, discrete standards for each performance level required under subsection (2) to ensure clear and sufficient differentiation in the performance levels and to provide consistency in meaning across school districts; the measurement of student learning growth and associated implementation procedures required under subsection (7); a process to permit instructional personnel to review the class roster for accuracy and *613 to correct any mistakes relating to the identity of students for whom the individual is responsible; and a process for monitoring school district implementation of evaluation systems in accordance with this section. Specifically, the rules shall establish a student learning growth standard that if not met will result in the employee receiving an unsatisfactory performance evaluation rating. In like manner, the rules shall establish a student learning growth standard that must be met in order for an employee to receive a highly effective rating and a student learning growth standard that must be met in order for an employee to receive an effective rating.

. Counts I through V of the amended complaint alleged various provisions in Chapter 2011-1, Laws of Florida, violated the appellants’ right to collectively bargain pursuant to article I, section 6 of the Florida Constitution. The trial court’s rejection of these claims, on the authority of Scott v. Williams, 107 So.3d 379 (Fla.2013), and Florida Public Employees Council 79, AFSCME v. Bush, 860 So.2d 992 (Fla. 1st DCA 2003), is not challenged on appeal.

. Under the statute, student learning growth is assessed by statewide assessments based on a formula adopted by the Commissioner of Education or, for subjects and grade levels not measured by statewide assessments, by "an equally appropriate formula” adopted by the school district. §§ 1012.34(3)(a); 1012.34(7), Fla. Stat. (2014).

. The "student learning growth” or student performance component can drop from 50 to "not less than 40 percent” for classroom teachers in certain circumstances. §§ 1012.34(3)(a) 1: 1012.34(3)(a)2; 1012.341, Fla. Stat. (2014). Where a teacher receives an "unsatisfactory" rating based on students' test performance, however, the "student learning growth” component becomes all-important, i.e., 100 percent de facto. See §§ 1012.33(1 )(a), (3); 1012.335(2)(c), Fla. Stat. (2014).

.Section 1012.34(2)(e), Florida Statutes (2014), provides, in its entirety:
The evaluation systems for instructional personnel and school administrators must:
[[Image here]]
(e) Differentiate among four levels of performance as follows:
1. Highly effective.
2. Effective.
3. Needs improvement or, for instructional personnel in the first 3 years of employment who need improvement, developing.
4. Unsatisfactory.
The Commissioner of Education shall consult with experts, instructional personnel, school administrators, and education stakeholders in developing the criteria for the performance levels.

. A teacher with a professional services contract who is rated "unsatisfactory” is immediately placed on probation for 90 days. § 1012.34(4)(b)l, Fla. Stat. (2014). Thereafter, if the teacher's "deficiencies” have not been corrected, the superintendent is authorized to recommend termination, § 1012.34(4)(b)2, Fla. Stat. (2014), and refer the matter to the Department of Education for possible action against the teacher’s certificate. § 1012.34(5), Fla. Stat. (2014). A teacher receiving "unsatisfactory" ratings in two consecutive years (or twice in three consecutive years) or a combination of three "unsatisfactory” and "needs improvement” ratings in three consecutive years is subject to dismissal during the teacher’s contract term, see § 1012.33(l)(a), Fla. Stat. (2014), and is ineligible for renewal of his or her employment contract. See §§ 1012.33(3)(b); 1012.335(2)(c)3, Fla. Stat. (2014).

. Some of the virtually automatic consequences prescribed by statute do not apply to teachers who had continuing contract status thirty years ago (prior to July 1, 1984). See § 1012.33(1 )(a), Fla. Stat. (2014) ("All such contracts, except continuing contracts as specified in subsection (4), shall contain provisions for dismissal during the term of the contract only for just cause,” which includes "two consecutive annual performance evaluation ratings of unsatisfactory under s. 1012.34, two annual performance evaluation ratings of unsatisfactory within a 3-year period under s. 1012.34, three consecutive annual performance evaluation ratings of needs improvement or a combination of needs improvement and unsatisfactory under s. 1012.34[.]”); § 1012.33(4)(a)-(c), Fla. Stat. (2014) (providing that an employee who had continuing contract status prior to July 1, 1984, is entitled to retain such contract and all rights arising therefrom, unless the employee voluntarily relinquishes the continuing contract; setting forth grounds for dismissal of such employees; and providing that "[ajny decision adverse to the employee shall be made by a majority vote of the full membership of the district school board.” But see § 1012.33(5), Fla. Stat. (2014) ("If workforce reduction is needed, a district school board must retain employees at a school or in the school district based upon educational program needs and the performance evaluations of employees within the affected program areas. Within the program areas requiring reduction, the employee with the lowest performance evaluations must be the first to be released; the employee with the next lowest performance evaluations must be the second to be released; and reductions shall continue in like manner until the needed number of reductions has occurred. A district school board may not prioritize retention of employees based upon seniority.”).

. The Florida Supreme Court has described the doctrine of separation of powers as providing the foundation of our tripartite form of government, Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004), and quoted James Madison, as follows: " ‘The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.’ ” State ex rel. Albritton v. Lee, 134 Fla. 59, 183 So. 782, 787 (1938) (quoting The Federalist No. 47, at 270 (James Madison)). To similar effect, "Montesquieu's Spirit of the Laws argues that genuine liberty is dependent on the rule of law, which in turn is dependent on a true separation of powers enforced by a system of checks and balances. [Harlan S. Abrahams, et.al., Separation of Powers & Administrative Crimes: A Study of Irreconcilables, 1976 So. Ill. L.J. 1, 19, 19 n. 60] (citing Montesquieu, Spirit of the Laws (Newmann ed. 1949)).’’ B.H. v. State, 645 So.2d 987, 991 (Fla.1994).

. ”[U]nder the doctrine of separation of powers, the legislature may not delegate the power to enact laws or to declare what the *601 law shall be to any other branch.” Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991).
The Legislature is permitted to transfer subordinate functions “to permit administration of legislative policy by an agency with the expertise and flexibility to deal with complex and fluid conditions.” Microtel, Inc. v. Fla. Public Serv. Comm’n, 464 So.2d 1189, 1191 (Fla.1985). However, under article II, section 3 of the constitution the Legislature "may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law.” Sims v. State, 754 So.2d 657, 668 (Fla.2000). This prohibition, known as the non-delegation doctrine, requires that "fundamental and primary policy decisions ... be made by members of the legislature who are elected to perform those tasks, and [that the] administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program.” Askew v. Cross Key Waterways, 372 So.2d 913, 925 (Fla.1978) .... "The statute must so clearly define the power delegated that the [executive] is precluded from acting through whim, showing favoritism, or exercising unbridled discretion.” Lewis v. Bank of Pasco County, 346 So.2d 53, 55-56 (Fla.1976).
Schiavo, 885 So.2d at 332. See also Sloban v. Fla. Bd. of Pharmacy, 982 So.2d 26, 29-30 (Fla. 1st DCA 2008) (recognizing that, despite the Legislature’s ability to transfer subordinate functions to " 'permit administration of legislative policy by an agency with the expertise and flexibility to deal with complex and fluid conditions,’ ” the Legislature may not delegate the right " 'to exercise unrestricted discretion in applying the law’ ” and is precluded "from delegating its powers 'absent ascertainable minimal standards and guidelines.' ” (citations omitted)).

. At the time this court heard oral argument in this case, section 1012.34(8), Florida Statutes (2011), (as initially enacted) provided:
The State Board of Education shall adopt rules pursuant to ss. 120.536(1) and 120.54 which establish uniform procedures for the submission, review, and approval of district evaluation systems and reporting requirements for the annual evaluation of instructional personnel and school administrators; specific, discrete standards for each performance level required under subsection (2) to ensure clear and sufficient differentiation in the performance levels and to provide consistency in meaning across school districts; the measurement of student learning growth and associated implementation procedures required under subsection (7); a process to permit instructional personnel to review the class roster for accuracy and to correct any mistakes relating to the identity of students for whom the individual is responsible [this phrase was moved to 1012.34(1) in 2014]; and a process for monitoring school district implementation of evaluation systems in accordance with this section. Specifically, the rules shall establish a student learning growth standard that if not met will result in the employee receiving an unsatisfactory performance evaluation rating. In like manner, the rules shall establish a student learning growth standard that must be met in order for an employee to receive a highly effective rating and a student learning growth standard that must be met in order for an employee to receive an effective rating.
Subsection 8 was subsequently amended during the 2014 legislative session, effective July 1, 2014. See Ch. 2014-23, § 13, at 649-50, Laws of Fla.
As amended, subsection 8 now provides that the "rules shall establish student peifonnance levels that if not met will result in the employee receiving an unsatisfactory performance evaluation rating” and "a student performance level that must be met in order for an employee to receive a highly effective rating.” § 1012.34(8), Fla. Stat. (2014) (emphasis supplied). Subsection 8 continues, however, to provide that the rules must establish "a student learning growth standard that must be met in order for an employee to receive an effective rating.” Id. (emphasis supplied). The focus of the staff analysis for Senate Bill 1642 is the rating of schools, not teachers, and it does not address the amendment to subsection 8. Subsection 1012.34(2)(e) was unchanged, and no party, has asserted that the 2014 amendment to subsection 8 should affect this court's analysis.

.
The Commissioner of Education approved a formula for measuring student learning growth on the Florida Comprehensive Assessment Test in reading and math, pursuant to section 1012.34(7), Florida Statutes (2011), and the State Board of Education initiated rulemaking to implement the formula, involving so-called “VAM data.” The formula is y.: =#⅛+⅞1⅞⅝ + 1⅞11⅞¾- + %⅜ ++ where yt denotes the test score for student /, ¾⅛ the coefficient associated with gfh prior test score, í¡¡ is the coefficient associated with variable j, B is the common school component of school k assumed 6 ^n(q,u¿\ a is the effect of teacher m in school k assumed and e is the random error term assumed s-^vCo,⅜).
Rule development workshops regarding the implementation of this formula in teacher evaluations were conducted in early 2013. But no rule establishing a formula for measuring student learning growth pursuant to subsection 1012.34(3), much less establishing "specific, discrete standards for each performance level” pursuant to subsection 1012.34(8) for measuring teachers' and administrators' performance, has yet been adopted. See 39 Fla. Admin. R. 20 (Jan. 30, 2013) (Notice of Development of Rulemaking for Proposed Rule 6A-5.0411, available at http://www.flrules.org/gateway/ruleNo.asp? id=6A-5.0411).

. In 1996, the Legislature amended section 120.52(8), defining "invalid exercise of delegated legislative authority,” by adding the following general standards in a closing paragraph (often referred to as the "flush left” paragraph):
A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement, interpret, or make specific the particular powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than the particular powers and duties conferred by the same statute.
Ch. 96-159, § 3, at 152, Laws of Fla. (emphasis supplied) (codified at § 120.52(8), Fla. Stat. (Supp. 1996)). The identical language was included in section 120.536(1), Florida Statutes (Supp. 1996). See Ch. 96-159, § 9, at 159, Laws of Fla. "The precise effect of this then new statutory language was at least originally a matter of some debate.” State Bd. of Trs. of the Internal Improvement Trust Fund v. Day Cruise Ass’n, Inc., 794 So.2d 696, 698 (Fla. 1st DCA 2001).

. See Day Cruise Ass’n, Inc., 794 So.2d at 698 n. 2 ("Compare Stephen T. Maher, How the Glitch Stole Christmas: The 1997 Amendments to the Florida Administrative Procedure Act, 25 Fla. St. U. L. Rev. 235, 242 n. 33 (1998) (predicting that ‘the adoption of the so-called map tack provision, which requires that agencies be able to show specific statutory rulemaking authority for the rules they adopt, promises to make rule challenges easier to win’) with Patrick L. ‘Booter’ Imhof & James Parker Rhea, Legislative Oversight, Fla. B.J., Mar. 1997, at 28, 30 (‘While the bases for agency rulemaking authority have been restricted by the act, it remains to be seen how the enunciated standard will be applied by the courts.... ’ ”)). As observed by Professor Rossi:
Opinions issued by the Florida Supreme Court [prior to the 1996 APA amendments] articulate[d] a range of standards, requiring legislative delegation of policymaking authority to contain an "intelligible principle,” have "adequate standards” to guide the agency, have "objective guidelines and standards,” be "accompanied by adequate guidelines,” or contain "reasonably definite standards.” Despite harsh rhetoric in the Florida Supreme Court's treatment of the nondelegation issue, it has been observed that courts in the state seldom [found] statutes unconstitutional.
Thus, notwithstanding the courts’ continued rhetorical adherence to strict separation of powers, many Florida regulatory programs operate[d] under fairly general legislative grants of power. For example, the Board of Medicine (Board), which regulates the licensing of physicians, [wa]s authorized to promulgate rules "as may be necessary to carry out the duties and authority” conferred ’ specifically by statute and "as may be necessary to protect the health, safety, and welfare of the public.”
The 1996 revisions to the Florida APA, however, seriously limit[ed] agency rule-making authority in future rulemaking proceedings ....
Jim Rossi, The 1996 Revised Florida Administrative Procedure Act: A Rulemaking Revolution or Counter-Revolution?, 49 Admin. L. Rev. 345, 359 (1997) (footnotes omitted).

. Thereafter, as recounted in Day Cruise Association,
In apparent response to the decision in Consolidated-Tomoka, the Legislature again amended sections 120.52(8) and 120.536(1) in 1999, stating its intent "to clarify the limited authority of agencies to adopt rules in accordance with chapter 96-159, Laws of Florida, and ... to reject the class of powers and duties analysis.” Ch. 99[-]379, § 1, at 3789, Laws of Fla. The legislative history of the 1999 amendments reflects a legislative intent that the standard for agency rulemaking be more restrictive than the standard explicated in what the Legislature deemed inappropriately broad judicial interpretations of the 1996 amendments to the APA, expressly including Consolidated-Tomoka:
[The bill] rejects a judicial interpretation of this standard which created a functional test to determine whether a challenged agency rule is directly within the class of *605 powers and duties identified in the statute to be implemented, [specifically citing Consolidated-Tomoka ]
Fla. H.R. Comm, on Govtl. Rules & Regs., CS/HB 107 (1999) (ch. 99-379, Laws of Fla.) Final Staff Analysis 5 (June 30, 1999); see also Kent Wetherell, Sour Grapes Make Sweet Wine, Fla. Bar. Environ, and Land Use Law Section, Section Reporter (Dec. 1999) <http://www.eluls.org/decl999-wetherell.html > ("Consolidated-Tomoka ... did not survive the legislative session following its rendition as it was effectively overruled by legislation adopted in the 1999 Session.... The 1999 legislation explicitly rejects the 'class of powers and duties’ test created by the court in Consolidated-Tomo-ka. ...”)....
Implementing this legislative intent to cabin agency rulemaking authority, the 1999 Legislature amended the "flush left” paragraph of section 120.52(8) and parallel language in section 120.536(1), by replacing the phrase "particular powers and duties” with the phrase "specific powers and duties,” and by expressly rejecting the judicial “class of powers and duties” gloss....
Day Cruise Ass’n, 794 So.2d at 699 (footnote omitted).

. In the new APA, Florida has expressed its intent to delegate less authority for agencies to formulate policy by rule. The Legislature has created a stricter test to be applied in determining the validity of agency rules by requiring more specific statutory authority than that minimally required by the Florida Constitution.
The new statutory test is applied to rules, not to statutes. But the intended effect of the statutory rulemaking provision differs from the constitutional nondelegation doctrine only in degree, not in direction. The nondelegation doctrine compels the Legislature to enact more detailed laws in response to judicial invalidation of extremely broad delegations of legislative authority. The new rulemaking provision is intended to compel the agency to return to the Legislature for more detailed laws as a response to an invalidation of rules by the Division of Administrative Hearings (DOAH) based upon very broad delegations of legislative authority.
[[Image here]]
... The concept of less delegation is linked to the requirement that the Legislature give more policy direction in enabling legislation.
F. Scott Boyd, Legislative Checks on Rule-making Under Florida’s New APA, 24 Fla. St. U. L. Rev. 309, 317-18 (1997) (footnotes omitted).

. In Florida Teaching Profession-National Education Association v. Turlington, 490 So.2d 142 (Fla. 1st DCA 1986), the plaintiffs (two classroom teachers and employee organizations that collectively bargained with school boards on behalf of instructional employees) sought a judicial declaration that sections 231.532 and 231.533, Florida Statutes (Supp.1984) (referred to as the "Merit Schools Program” and the "Master Teacher Program” provisions), were unconstitutional. The Merit Schools Prograñt authorized state funding for voluntary, locally-negotiated plans designed to increase the performance of students and provide economic incentives for teachers and other school personnel who met specified statutory criteria. The Master Teacher Program authorized incentive awards to teachers who voluntarily documented their fulfillment of statutory eligibility criteria. The Turlington plaintiffs challenged the statutory provisions in part as " unlawful, standardless delegation[s] of legislative authority to the Department of Education in violation of the principle of separation of powers.' ” Id. at 145. This court, in reject *606 ing the plaintiffs’ arguments, adopted verbatim the order of the trial court. Id. at 143.
A Westlaw search indicates the decision in Turlington has been cited in an appellate decision only once-by this court in a citation per curiam affirmance without opinion. See Petersen v. Dep't of Educ., 508 So.2d 540 (Fla. 1st DCA 1987).
Appellees argue that subsection 8, like the statutory provisions at issue in Turlington, " 'confers permissible administrative discretion' " on the State Board of Education " 'to administer new and innovative programs,' ” without violating the prohibition against enabling executive officials to " ‘say what the law is.' " They contend that subsection 8 calls for the Board to “flesh out rules within certain defined parameters,” like the statutes upheld as constitutional in Turlington. Subsection 8 does not, however, contain the guidance the statutory provisions at issue in Turlington provided.
The basis for the Turlington plaintiffs’ argument that the Merit Schools Plan " 'represent[ed] an unlawful, standardless delegation of legislative authority to the Department of Education in violation of the principle of separation of powers' " is not entirely clear from the decision. Turlington, 490 So.2d at 145. Nor is the basis for the trial court's (and hence this court's) rejection of the argument. The Turlington trial court addressed the argument as follows:
The initial Merit Schools Plan sanctioned by Plaintiff Pinellas Classroom Teacher Association is presented as a primary example of what Plaintiffs believe to be unlawfully exercised discretion. The Court is not persuaded that the initial failure by the Department of Education to approve this plan was in any way unlawful. Indeed, the plan as originally submitted did not require student test score improvement as a mandatory criterion for selection. This was required by statute. Too, it must be noted that the Merit Schools statute necessarily permitted a range of plan options to be negotiated at the local level. It seems somewhat ironic that the range of options specified in the statute is argued to confer unconstitutional discretion on the Department of Education but at the same time it is argued that the Merit Schools Program 'chokes' the bargaining process. Quite obviously, a balance must be struck and the Court finds that the balance so struck is appropriate.
Id. at 146. The court in Turlington determined that the challenged statutes did not " 'permit the unrestricted exercise of discretion by officials of the Department of Education.' " Id. at 146. The court concluded the statutes " 'conferred] permissible administrative discretion on the Department of Education officials to administer new and innovative programs, but they do not enable those officials to "say what the law is.” ' " Id. (citation omitted). In reaching its decision, the court observed that the “ ‘programs may not to date have proven all that one might have hoped,' " but " ‘expresse[d] the view that Department of Education officials responsible for fleshing out these programs have achieved rather remarkable success in carrying out expressed legislative intent in a short period of time.... [The statutes] are imperfect to be sure. More fine tuning will be required before results can be evaluated.’ " Id. at 147.

. Any misdirection the Turlington opinion can be said to offer in this regard is not binding on the en banc court.

. In rejecting this argument, the Turlington trial judge opined:
This argument, however, seems to overlook that the “extra points” available under the statute may only be recommended by the principal. Also overlooked is the fact that candidates who are denied associate master teacher designation may also obtain review of such decision under Sec. 120.57, F.S. The safeguards contained in the statute and in the aforestated Rule, in the Court’s view, adequately protect candidates for associate master teacher designation from the arbitrary exercise of discretion.
Id. at 146. The trial court described the rules as setting “ 'forth extensive criteria governing the performance evaluations and subject area examinations required by the program,'" " 'prescribing] that acceptable subject area examinations for certification as associate master teachers can be either a Specialty Area Test of a National Teacher Examination or a subject area examination constructed by the Institute for Instructional Research and Practice and Student Education Evaluation and Performance,’ ” and providing that " '[a]ll subject area examinations ... be approved by the State Board of Education.' ” Id. at 144-45.

. Subsections 1012.34(7) and 1012.34(2), Florida Statutes (2014), do not provide sufficient standards or guidelines for application of subsection 8. Subsection 1012.34(7) does list factors that must be, factors that may be, and factors that may not be taken into consideration by the Commissioner of Education in developing a formula to measure individual “student learning growth.” But it gives no guidance on where or how to set “uniform cut scores.” It does not illuminate what the relationship between individual "student learning growth” and “uniform cut scores” should be or what purpose the relationship should serve.

. Effective March 24, 2011, through May 11, 2015.